Graham, Bibb, Wingo & Foster, Birmingham, for appellant.

61 So.2d 35

### ATLANTIC COAST LINE R. CO. v. BARGANIER.

### 6 Div. 167.

Supreme Court of Alabama.

Jan. 3, 1952.

Rehearing Denied June 26, 1952.

Further Rehearing Denied Nov. 6, 1952.

95

Taylor, Higgins, Windham & Perdue, Birmingham, for appellee.

BROWN, Justice.

The plaintiff, appellee here, sued the appellant Atlantic Coast Line Railroad Company, a corporation, its engineer Watts and its conductor Smith in charge of and operating its freight train, in trespass on the case for injury to his person and property,—a Chevrolet 1936 Model automobile, —averring as inducement that while the plaintiff was driving said automobile on August 9th, 1948, "along a public highway, known as Midfield Road, which said public highway then and there crossed said railroad track at grade near Powderly, Alabama, the defendants ran said train against plaintiff's said automobile, and as a proximate consequence thereof plaintiff was injured and damaged as follows:

"His spinal column was broken and fractured; he suffered a concussion of the brain; he was injured internally; he was permanently injured, permanently scarred and permanently disfigured; his head, neck, shoulders, back, limbs, abdomen and other parts of his body were cut, lacerated, bruised, contused and otherwise injured; the muscles and ligaments of his back, arms, abdomen and other parts of his body were sprained, strained, torn, twisted, wrenched and otherwise injured; his nervous system was greatly shocked and im--

paired, was permanently shocked and impaired; he was rendered unconscious for a long period of time; he was confined to the hospital, to the bed and to the house for a long period of time; he was caused to suffer great physical pain and great mental anguish; he was made sick, sore and ill for a long period of time; he was prevented from engaging in his customary employment for a long period of time, and was caused to lose the remuneration which he would otherwise have received therefor; he was rendered permanently less able to work and earn money, and his ability to work and earn money was greatly impaired; he was put to great trouble, great loss of time and great expense in and about procuring medical and hospital care, medicines, and medical supplies and services in and about an effort to heal and cure his said wounds and injuries; and the body, motor, chassis, wheels, tires and other parts of his said automobile were broken, bent, mashed, torn, twisted and otherwise damaged, and his said automobile was rendered less valuable.

"And plaintiff avers that all of his said injuries and damages were caused as a proximate result of the negligence of the defendants in and about the operation of said railroad train at said time and place."

The second count adopted the first count down to and including the cataloguing of damages claimed and averred that said injuries and damages were proximately caused by defendants' wanton conduct in running its said locomotive against the plaintiff's automobile on said crossing.

The defendants pleaded to both counts the general issue, in short by consent, with leave to offer in evidence any fact or facts which if specially pleaded would constitute a defense to the counts of the complaint or either of them.

While Mr. Bibb, counsel for the defendant, was making the closing argument for the defendant and about the time he was concluding said argument, the plaintiff offered an amendment to his complaint by striking Smith as a party defendant and by adding the following averments, as to the damages claimed: " '2. By adding at the beginning of the second paragraph of Count 1 thereof, the following words: *"He was so injured about the body that his sexual capacity was impaired and he was rendered unable to engage in sexual intercourse; his bladder was injured and impaired, and his hearing was impaired." ' "*

As soon as the amendment embodying the claim above italicized came to the attention of defendants' counsel, he objected to said added claim on grounds, among others, that it came too late; that it was not supported by the testimony of medical witnesses; that defendants were deprived of the right to cross-examine witnesses on said subject; that defendants were deprived of the right to offer countervailing evidence and to argue the same to the jury. The court overruled the objections and allowed said amendment and the defendants separately excepted. The record shows that said amendment was proposed after Mr. Foster, one of the defendants' counsel, had presented request for charging the jury in writing, that damages for loss of sexual capacity could not be awarded because the same were "special damages", not claimed.

The trial resulted in a verdict acquitting the engineer and assessing the damages in favor of the plaintiff against the railroad company for $60,000 followed by a judgment of the court on said verdict.

On the hearing of the motion for a new trial duly filed, the plaintiff, to avoid the granting of the motion, at the suggestion of the trial court filed a remittitur, reducing the amount of the damages to $42,500 and the motion for a new trial was overruled. The defendant railroad company duly excepted.

One of the contested issues, left for jury decision, was whether or not under the evidence the plaintiff observed the duty imposed on him by law to stop, look and listen before attempting to cross the railroad track. On that subject, in connection with the oral charge, the court gave the following special written charges.

"Charge No. 14. The Court charges the jury that one who is about to cross a railroad track must stop so near to the track and survey by sight and sound must so immediately precede his effort to cross over it as to preclude injection of an element

of danger from an approaching train into the situation between the time he stopped, looked and listened and his attempt to proceed across the track.

"Charge No. 15. The Court charges the jury that under the law it is the duty of a person intending to cross a railroad track to stop, look and listen for approaching trains, and this use of the senses must be made within such nearness to the track and under such circumstances as will afford the traveller the knowledge whether or not he can cross the track with reasonable safety from collision with an approaching train. And the Court further charges you that this duty is a continuing one to the extent of excluding the injection of an element of danger in his attempt to cross between the time he last stopped, looked and listened, if he did so, and the time he entered the zone of danger made by trains entering the crossing.

"Charge No. 25. The Court charges the jury that a failure of the defendant's servants or agents to sound the whistle or ring the bell, if such were the fact, in approaching the crossing at which the collision complained of occurred did not relieve the plaintiff, Calvin F. Barganier, of the duty of stopping his vehicle and looking and listening for approaching trains before attempting to cross the railroad tracks.

"Charge No. 29. The Court charges the jury that if you are reasonably satisfied from the evidence that there were obstructions which interfered with the plaintiff's view of the railroad track as he approached within one hundred feet of the railroad crossing on the occasion complained of, then it was the plaintiff's duty, in the exercise of reasonable care for his own safety, to stop and to look and to listen for approaching trains at a point where he could best see and hear an oncoming train before undertaking to cross the railroad track.

"Charge No. Y. I charge you gentlemen of the jury that before entering upon the crossing Mr. Barganier was under the duty of using reasonable care in listening to determine whether or not any train was approaching the crossing.

"Charge No. 20. The Court charges the jury that the engineer or other person in charge of the train approaching the public road crossing at which the collision complained of occurred was not required to blow the whistle continuously or to ring the bell continuously but that the duty imposed on him by law was that at short intervals commencing one-quarter of a mile before reaching the crossing either the whistle be blown or the bell be rung, one of the other."

The evidence shows that while plaintiff was driving his Chevrolet automobile on the Midfield Road leading from the old Bessemer Highway across to the new Super Bessemer Highway, proceeding in a northwesterly direction between six and seven o'clock on the morning of August 9, 1948, the defendant's locomotive pulling a freight train being operated by the defendant Watts collided with said automobile just as the front wheels of the automobile reached the northwestern rail of the single line railroad track and threw the automobile to the northwestern side of the railroad against the cross-arm sign post standing on the northwestern corner of the intersection, causing said cross-arm post to lean slightly to the northwest. The locomotive contacted the right rear wheel and fender of the automobile, wrecking the same and injuring plaintiff, who was caught and pinned in some way under the running board with his feet extending to the front part of the tonneau of the automobile.

No one saw the collision except the plaintiff, the fireman and the engineer operating the train and there was no other vehicle or person in sight of the crossing at the time of the collision. The fireman's testimony, which was without dispute, was that as the train approached the crossing, he was keeping such lookout ahead as was consistent with his duties to fire the engine with coal and supply the boiler with water by operating the injector, and just before the front of the locomotive reached the crossing he saw the automobile, to use his words, "flash upon the crossing out of nowhere" and he hollered to the engineer "car" and when he saw the automobile, it was entering on the crossing. The only other employee of the defendant

railroad company in a position to observe the incident was the front brakeman, who occupied a seat by the side of the fireman's seat. He testified that he was keeping a lookout and just about the time and immediately before the collision, steam from the boiler or spray of water from the injector which was being operated clouded his glasses, so that he could not see, and while in the act of removing his glasses to clear them from their clouded condition, the locomotive came in contact with the automobile. His testimony further goes to show that he was new on this run, was not familiar with the road and did not know that there was such a crossing as Midfield Crossing.

The engineer's testimony was to the effect that he had been engaged in operating as fireman and engineer on "that run for twenty-seven years" and "was familiar with Midfield Crossing. That he started from Elyton, the terminus near Birmingham, one day and returned the next day. His testimony further goes to show, and it is not disputed, that he was sitting at the engineer's place in the cab of the locomotive on the right-hand side, and when the engine approached the crossing and was within two hundred feet thereof, the boiler and smoke stack obscured his view of the left rail of the tracks and the left side of the road crossing; that he did not see plaintiff's automobile until it was on the crossing and the front wheels of the automobile had reached the northwest rail of the railroad tracks. His testimony is further to the effect that the bell was ringing, operated by the automatic ringer from the time he left the terminus at Elyton until he reached the crossing; that he began to blow the crossing signal a quarter of a mile down from the crossing and was blowing the last blast of the crossing signal as the car flashed in his view; that he released the whistle and immediately applied the brakes in emergency; that nothing else could be done by an engineer to slacken the speed or stop the train.

The train consisted of the locomotive, its tender, twenty-one cars and the caboose with eight wheels to each. The engine was working steam and was making the usual noise as it approached Midfield Crossing. The evidence further shows that the firebox had been freshly fired with eight or nine scoops of coal, causing the emission of black smoke from the smoke stack. The defendant's evidence further goes to show that the train was moving about 30 miles per hour and the noise of its approach was discernible. It was daylight and the weather was clear.

The undisputed evidence shows that the crossing was in the open country, not in a thickly populated district. The nearest habitation to the crossing, so far as the evidence shows, was the plaintiff's home, which was one-third mile or more from the crossing, and a filling station on the old Bessemer Highway at the Midfield Road intersection. There was no noise other than that of the plaintiff's automobile to distract plaintiff's attention or to obscure the noise made by the train.

Appellee himself testified as to his frequent use of this crossing over a long period of time. Plaintiff's witness, Mr. J. R. Bunn, examined by plaintiff's counsel, testified in this regard as follows:

"Q. You were talking about the time you came along there. About the time of day you came along there, between six and seven o'clock in the morning what was the traffic; did it have much on it then or not much or little bit or a lot?"

(After Mr. Bibb's objection was overruled and an exception reserved the witness answered):

"A. I imagine it had quite a bit of traffic, people going to work from there.

"Q. I am not talking about what you imagined. I am talking about what you had observed; you had been through there before? A. Yes; I would say quite a bit crossing at those times.

"Q. Quite a bit of traffic on it at that time of day? A. Yes. * * *."

Plaintiff's witness Mr. J. M. Herring testified as follows:

"Q. Is that a much used, traveled highway out there? A. Yes, sir."

And the defendant's conductor C. B. Smith testified as follows:

"Q. You had been familiar with that crossing over the years you have worked on that line? A. Yes, sir.

"Q. And at that time in the morning with people going to work out there at the Tennessee Company it is a pretty *populace* crossing, is it not? A. It has been, yes, sir.

"Q. I say about that time of morning it has had much travel by automobiles over it? A. At times we have seen lots, and at times not any.

"Q. At that time in the morning it is usually a good many, isn't it? A. I don't know.

"Q. Isn't that about the time you usually pass there? A. I said at times you usually get few and at times many.

"Q. Sometimes you would pass it and not see a car? A. Yes, sir.

"Q. You knew from your many years of experience in passing over that crossing it was a popular crossing? A. Yes, sir.

"Q. And a hard surface crossing. A. Yes, sir."

In addition to the foregoing direct evidence on the point, the evidence showed that the crossing was used by several other people. Mr. Thomas M. Bailey testified that he had used the crossing at about 6:30 A.M. every day for 7 or 8 years. Mr. James Henry Burgess testified that he had been using the crossing off and on for about three or four months and on this particular day he went across the crossing about 6:25 or 6:30 A.M. on his way to work. Miss Mildred Farmer had used the crossing going to and from work every day for about six years. Mr. J. L. Thomas had used the crossing off and on since 1925. Mr. C. W. Buffington had used the crossing for as long back as he could remember (he was 36 yrs. old) and for a long time he had crossed it every day. Mr. Jessie Moore had lived at Grasselli for 27 yrs. and had used the crossing lots of times. Sometimes he used it once a week and sometimes every day during the week. Mr. W. J. Leighton, an insurance agent, had used the crossing in working his debit three or four times a week for about two and one-half years. Mr. J.

S. Pitts had used the crossing twice a day for a good long time prior to the accident.

The evidence further showed that the engineer Mr. Watts had been running on that line either as an engineer or a fireman for 27 years.

The evidence further showed that just off of and to the right of the Midfield Road, on which plaintiff approached the crossing, commencing from 400 to 500 feet of the crossing, a bank covered with growing weeds and bushes and extending up to the right-of-way, tended to obscure or lessen visibility to the east, the direction from which the train approached the crossing, a condition observed by and known to the plaintiff. Plaintiff testified as a witness in his own behalf as follows:

"Q. Now, Mr. Barganier, back in the summer of 1948 in traveling from your home out to the place of your employment with the Tennessee Company, did you customarily use what is known as the Midfield Road? A. Yes, sir.

"Q. How often did you travel that road, Mr. Barganier? A. As much as twice a day or more.

"Q. How long had you been traveling the road with that regularity? A. Possibly three years or a little over.

"Q. Where is your place of work with the Tennessee Company, at that time? A. Fairfield.

"Q. Are you familiar with the place where the Atlantic Coast Line track crosses the Midfield Road between the old Bessemer Highway and the Super Highway? A. Yes, sir.

"Q. Is that in Jefferson County, Alabama? A. Yes, sir.

"Q. Now, Mr. Barganier, on the date— by the way, you are the man who received the injuries out there on August 9, 1948, aren't you? A. Yes, sir; I can vouch for that.

"Q. Were you driving the automobile you were in? A. Yes, sir.

"Q. What kind of car was that, Mr. Barganier? A. 1936 Standard Chevrolet two-door.

"Q. 1936? A. Yes, sir.

"Q. In going from where you lived out towards Fairfield plant, where you worked, did you travel from the old Bessemer Highway toward the Super Highway? A. Yes, sir.

"Q. On the date when this accident happened were you traveling in that same direction from the old Bessemer Highway toward the new Super Highway? A. Yes, sir.

"Q. Is that road there a hard surface road, a black top road, Midfield Road? A. Black top.

"Q. Black top, and it was black top at that time? A. Yes, sir.

"Q. About what time of day, Mr. Barganier, the best you can tell us, would you say this accident happened? A. It was sometime between 6:05 or 10 and 6:20 in the morning.

"Q. You would say near 6:15? A. Yes, sir; because my habit of leaving the house was around 6:05 or 6:10.

"Q. How far did you live from the crossing? A. The way I had to go it was approximately one-third of a mile, I guess, or a little further.

"Q. Now, Mr. Barganier, on this occasion, where did you get on Midfield Road? A. I would say it was toward Birmingham from my house. I turned to the left at Pierce's Filling Station.

"Q. What distance had you been on the road before you reached the crossing— maybe I can get at it that way—to come off of the old Bessemer Highway onto the road? A. Yes; I came onto the road.

"Q. Yes, sir; that was what I was trying to get at.

"Now, Mr. Barganier, as you approached this particular crossing that we are talking about, I wish you would tell these gentlemen here, if you will, about what speed you were operating your automobile back, I will say, within four or 500 feet of the crossing as you approached the crossing, but before you arrived at it, about what speed were you driving? A. Four or 500 feet back from the crossing?

"Q. Yes, sir. A. I wasn't traveling over 10—between 10 and 15 miles an hour

500 feet back from the crossing, if that fast. I hadn't been over 20 miles an hour when I left home.

"Q. Did you stop your automobile before you proceeded on across? A. Yes, sir.

"Q. Did you bring your car to a dead stop? A. Yes, sir.

"Q. Did you listen? A. Yes, sir.

"Q. Did you look? A. Yes, sir.

"Q. Did you look in both directions? A. Yes, sir.

"Q. In what position did you stop the front of your car—I will say the front bumper of your car, in what position did you stop that front bumper with reference to the nearest rail to you? A. I would say within three or four feet of the first rail, the rail nearest to me.

"Q. At that time did you look up the track to your right? A. Yes, sir.

"Q. How far could you see the track in that direction, Mr. Barganier?

"Mr. Bibb: We object to that question as to how far he could see the track in that direction.

"The Court: You can ask him how far he saw it.

"Q. How far did you see the track in that direction? A. Less than 50 feet.

"Q. Was there anything between you and a point 100 feet up that track? A. Yes, sir.

"Q. All right. What was it? A. A bank, bushes, shrubbery and grass.

"Q. When you stopped and looked, did you see any train approaching from that direction? A. No, sir.

"Q. Did you hear any train approaching from that direction? A. No, sir.

"Q. Did you hear any bell ringing? A. No, sir.

"Q. Did you hear any whistle blowing? A. No, sir.

"Q. Did you hear any locomotive working or making a noise? A. No, sir.

"Q. Well, after you stopped and looked and listened, what did you do then? A. I proceeded across the crossing.

"Q. Did you put your car in high gear? A. No, sir; I put it in low gear as I crossed the crossing, looking both ways, one at a time and then the other.

"Q. You were looking back and forth both ways? A. That is right, as I was easing on the crossing.

"Q. Easing on the crossing? A. Yes, sir; because it was rough.

"Q. Did you observe the train which later struck you at any time before it struck you? A. Yes, sir.

"Q. Where was the train when you observed it? A. It was aproximately 250 or 300 feet from where I was sitting.

"Q. Where was the front of your automobile when you observed it? A. I would say the front wheels were within 18 inches of the far rail.

"Q. Was there anything between the position you were in and the train until you got within 18 inches of the far rail; if there was, what was it? A. It was that bank and shrubbery was in my way until my front wheels crossed the rail.

"Q. All right, sir. How long have you been driving cars, Mr. Barganier, automobiles? A. Approximately 35 years.

"Q. What speed, in your judgment, were you making from the time you started up and eased out on that track until you saw the train? A. When I first started off I would say I wasn't going over three or four miles an hour, but I imagine when I seen that train whatever it would do in just a few minutes in low is what it did.

"Q. I was going to ask you about that. A. Which is approximately 10—9 or 10 miles an hour.

"Q. Your judgment is you were making nine or ten miles an hour when the train— A. When I was struck.

"Q. —when the train struck you? When you observed the train, what did you do? A. I pushed on the accelerator to try to get out of the way.

"Q. And at that time you say in your judgment the front wheels were within 18 inches of the far rail? A. Within 18 inches of the far rail.

"Q. In other words, it was across the first rail, and lacked just that much being to the second rail? A. Lacked that much being to the second rail.

"Q. In your judgment, Mr. Barganier, what speed was the train making? A. I would say it was making between 45 and 50 miles per hour.

"Q. Did the train hit your car in front of where you were sitting, even with you, or behind where you were sitting? A. He hit behind where I was sitting. * *."

The plaintiff further testified on cross examination that his automobile was between sixteen and eighteen feet in length. Plaintiff's Exhibit "C" showing a picture of plaintiff's wrecked automobile after the wreck and showing the growth on each side of the railroad right-of-way indicates that the growth stands equal to or slightly above the step or running board of the automobile and that the width on each side of the right-of-way was about that of the automobile's length from the ends of the ties outward, giving a clear view of the railroad tracks as far as the eye can see. Defendants' Exhibits 1 and 2 illustrate the same condition.

Plaintiff's Exhibit "D", the hospital chart and history of his injury and treatment in the hospital, made in due course, contains the following: "This 44 yr. old white male was in an auto hit by a train about 6:30 AM. The pt. remembers being on the R. R. tract (track) and seeing the train. He tried to speed up to get out of the way. The pt. was knocked unconscious and the next thing he knew he was in the ER (Emergency Room). * * *." § 415, Tit. 7, Code of 1940.

The appellee insists that the evidence presented a case for the jury under both counts of the complaint. To this we do not agree. Under repeated rulings here, the plaintiff's testimony that he stopped, looked and listened, in the face of the circumstances that if he had stopped, looked and listened he could have either heard or seen the train which was moving toward the crossing and near thereto when the plaintiff drove his automobile on the railroad track, does not constitute a conflict in the evidence, under the circum-

stances hereinafter stated. Peters v. Southern R. Co., 135 Ala. 533, 33 So. 332; Southern Ry. Co. v. Irvin, 191 Ala. 622, 68 So. 139; Central of Georgia Ry. Co. v. Graham, 218 Ala. 624, 119 So. 654.

The evidence is without dispute that the trainmen used all means at hand to check the speed of the train and to stop it as soon as they became aware of the plaintiff's peril. Louisville & N. R. Co. v. Sunday, 248 Ala. 597, 28 So.2d 796.

The high bank along the right side of the highway, with the growth of weeds and bushes, imposed on the plaintiff the duty of using greater precautions to ascertain that he could proceed with safety, before driving his automobile on to the railroad track. Memphis & Charleston R. Co. v. Martin, 117 Ala. 367, 383, 23 So. 231; Highland Ave. & Belt R. Co. v. Sampson, 91 Ala. 560, 8 So. 78.

There is no doubt but what the train was moving toward the crossing and was near to it when the plaintiff drove up to the railroad tracks. The evidence further showed it was broad daylight and the train was making the usual noise and emitting black smoke and if the plaintiff had stopped, looked and listened in the space of the railroad right-of-way, he could have seen and heard the approaching train. To give credence to his testimony overtaxes judicial credulity. Peters v. Southern R. Co., 135 Ala. 533, 33 So. 332; Louisville & N. R. Co. v. Simmons, 251 Ala. 131, 36 So.2d 460; Shelton v. Hacelip, 199 Ala. 535, 74 So. 950.

The doctrine holding trainmen and their employers liable to "by passers" for personal injuries and property damage proximately caused by their wantonness in handling railroad trains on their own tracks and rights-of-way is applicable alike to trespassers on the railroad track and those who are not trespassers, who merely exercise their right to cross the tracks in thickly populated districts, whether it be an unguarded public road crossing, private crossing or in spaces between where no crossway is provided.

The court, dealing with the wanton count in Peters v. Southern Railway Co., 135 Ala. 533, 33 So. 332, 333, observed: "It has been repeatedly held, before one can be convicted of wantonness the facts must show that he was conscious of his conduct, and conscious, from his knowledge of existing conditions, that injury would likely or probably result from his conduct, and that with reckless indifference to consequences he consciously and intentionally did some wrongful act, or omitted some known duty, which produced the injury. Memphis & C. R. R. Co. v. Martin, 117 Ala. 367, 23 So. 231; Burson v. Louisville & N. R. R. Co., 116 Ala. 198, 22 So. 457; Birmingham Railway & Electric Co. v. Bowers, 110 Ala. 328, 20 So. 345; Alabama G. S. R. R. Co. v. Hall, 105 Ala. 599, 17 So. 176; Anniston Pipe Works Co. v. Dickey, 93 Ala. 418, 9 So. 720; and other cases might be cited. There was no evidence of knowledge on the part of defendant's engineer, or, as for that matter, of any other person on the locomotive, of plaintiff's peril, or presence on the track, or knowledge of existing conditions at the time and place of the accident that injury would likely or probably result to the plaintiff, or any one else, from the speed at which the train was being run. The general charge for the defendant under the first count we think was properly given."

Simple negligence, "the inadvertent omission of duty", is not an element of wantonness. McNeil v. Munson S. S. Lines, 184 Ala. 420, 63 So. 992.

In Georgia Pacific Railway Co. v. Lee, 92 Ala. 262, 272, 9 So. 230, 234, the court speaking through Justice McClellan observed: " * * * The doctrine is not based on the idea that they ought to have sooner observed the danger, however, but on the ground that they knew of its existence,—of the presence of people in positions of peril,—as a matter of fact, without seeing them at all in the particular instance. We fully subscribe to this doctrine, but deny its application in the case at bar. Some of the evidence went to show that this train was running at from 15 to 25 miles an hour, and that no signals were being given. But, conceding that such a rate of speed and such absence of warnings might stand for recklessness and wantonness in approaching a crowded

thoroughfare, the locality here involved is not shown by any tendency of the evidence to have been of that character. At most, it was but the crossing of a considerably traveled public road over the railway, and there was nothing in the situation, assuming that it was well known to the trainmen, to justify the imputation to them of a consciousness that a natural or probable result of their conduct would be the infliction of injury to persons or property at that point. * * *."

And again in Nave v. Alabama Great Southern Railroad Co., 96 Ala. 264, 267–269, 11 So. 391, 392, Justice Coleman speaking for the court said: "The rule declared in Glass v. Memphis & Charleston Railroad Co., [94] Ala. [581], 10 So. [215], 218, is as follows: 'One who is injured in consequence of being negligently on a railroad track cannot recover unless the railroad employes are guilty of such gross negligence or recklessness as amount to wantonness or an intention to inflict the injury, and that this wantonness and intention to do wrong can never be imputed to them unless they actually know (not merely ought to know) the perilous position of the person on the track, and with such knowledge fail to resort to every reasonable effort to avert disastrous consequences; and this doctrine applies as well to *densely populated neighborhoods in the country, and to the streets of a town or city, as to the solitude of* the plains or forest.' The rule is further stated in Georgia Pacific Railway Co. v. Lee, [92] Ala. [262, 271], 9 So. [230] 233, as follows: 'The failure to keep a lookout, which it was the duty of defendant's employes to maintain, and which would sooner disclose the peril of the driver and plaintiff's wagon and team, even conceding that such would have been the case, was, at the most, mere negligence, inattention, inadvertence; * * * that the purpose to accomplish a given result cannot be imputed to mental conditions, the very essence of which is the absence of all thought on the particular subject.' The proposition declared in the citation from the case of Glass v. Memphis & Charleston Railroad Co., supra, that 'wantonness and in-

tention to do wrong can never be imputed to them unless they actually know, (not merely ought to know,)' must be taken in connection with, and as limited in, the case of Georgia Pacific Railway Co. v. Lee, 92 Ala. [262] 271, 9 So. 230, to the effect 'that to run a train at a high rate of speed, and without signals of approach, at a point where the trainmen have reason to believe there are persons in exposed positions on the track, *as over an unguarded crossing in a populous district of a city,* or where the public are wont to pass on the track with such frequency and in such numbers,—facts known to those in charge of the train,—as that they will be held to a knowledge of the probable consequences of maintaining great speed without warnings, so as to impute to them reckless indifference in respect thereto, would render their employer liable for injuries resulting therefrom, notwithstanding there was negligence on the part of those injured, and no fault on the part of the servants after seeing the danger. The doctrine is not based on the idea that they ought to have sooner observed the danger, however, but on the ground that they knew of its existence,—of the presence of people in positions of peril,—as a matter of fact, without seeing them at all in the particular instance.' "

And again in Highland Ave. & Belt R. Co. v. Robbins, 124 Ala. 113, 117, 27 So. 422, 424, the court observed: "This doctrine was again, and more recently, considered and approved in Haley v. Kansas City, M. & B. R. Co., 113 Ala. 640, 21 So. 357, where it was said: 'There is no reason why this doctrine does not apply as well to densely populated neighborhoods in the country, when the conditions exist * * * [to call it into exercise] as to cities, towns and villages. *It is the likelihood of peril to the safety of passers-by, known to defendant's employés, that makes the duty, and not the place itself.* Nave's and Lee's cases supra;' Memphis & C. R. Co. v. Martin, 117 Ala. 367, 23 So. 231."

This doctrine was reaffirmed and applied in Louisville & N. R. Co. v. Heidtmueller, 206 Ala. 29, 89 So. 191, on the authority of Highland Avenue & Belt Railroad Co. v.

Robbins, supra, and the statement noted below in the opinion in Southern R. Co. v. Stewart, 179 Ala. 304, 60 So. 927, 930, that such frequent use *must coexist with the proximity of a populous city or village,"* was pronounced dictum. Chief Justice Anderson, the writer of the majority opinion in the Heidtmueller case, supra, after stating the substance of what the evidence showed, held that the neighborhood at the place of the catastrophe was not so populous and the use of the railroad tracks was not so constant and continuous as to charge the engineer with knowledge of the presence of persons on the railroad tracks in a place of peril, and held that the defendants were due the affirmative charge.

The statement of the doctrine relative to liability for wanton injury or damage in paragraph [1] of the opinion in the case of Central of Georgia R. Co. v. Pope, 221 Ala. 145, 127 So. 835, is quoted from the opinion in Georgia Pacific Railway Co. v. Lee, 92 Ala. 262, 271, 9 So. 230, and there is nothing inconsistent or in conflict therein with the cases cited above.

In Northern Alabama Ry. Co. v. McGough, 209 Ala. 435 [436], 96 So. 569, 570, the court speaking through Chief Justice Anderson observed: "This case went to the jury on the third or wanton count alone, and there was sufficient evidence to justify the submission to them and to support the verdict for the plaintiff under said count. True, the speed of the train alone at the point in question did not constitute wantonness, but when accompanied with evidence showing that *the point of injury was a populous crossing, and that people were in the habit of crossing with great frequency at this time of year and hours of the day, and that the train was operated without signal or warning, there being proof from which the jury could infer that the enginemen were conscious of conditions and probable injury, the plaintiff made a case for the jury,* * * *."* [Italics supplied.]

The utterances quoted differentiates the case at bar from the McGough case. Here the testimony relied on by the plaintiff to convict the trainmen of wantonness falls far short of showing that the crossing in question "was a populous crossing", nor does it show or tend to show that people were in the habit of crossing "with great frequency" at that hour of the day or that the train was being operated without signals of its approach. In addition to what we have heretofore stated, before the witness Dull reached the scene of the collision the train had been stopped, with the locomotive standing about one thousand feet from the crossing and the engineer had left his cab and walked back to the crossing and he and the conductor were trying to relieve the plaintiff when said witness drove up in his car. Several minutes later others came along, but not with "great frequency". It cannot be assumed that the learned Chief Justice and his associates used the word "populous" in a judicial opinion without comprehending the force of its meaning. See Webster's New International Dic. 1946 Ed. p. 1921.

We are, therefore, of opinion that the trial court erred in refusing the defendant's affirmative charge as to the wanton count.

There is not a scintilla of evidence going to show that the fireman Davenport, the ligence or wantonness and the effect of the verdict acquitting the engineer also acquitted the defendant of liability. Walker v. St. Louis-San Francisco Ry. Co., 214 Ala. 492, 108 So. 388; Southern Railway Co. v. Lockridge, 222 Ala. 15, 130 So. 557; Southeastern Greyhound Lines v. Callahan, 244 Ala. 449, 13 So.2d 660; Waters v. Anthony, 256 Ala. 370, 54 So.2d 589.

The statute requires railroad companies to set up cross-arms of warning at public crossings, notifying all desiring to cross to look out for trains, and also requires the engineer operating the train over a crossing to blow the whistle or ring the bell and to keep a look-out for persons traveling on the highway. The failure to comply with these statutes is simple negligence. The basis for the doctrine of "stop, look and listen" is rested upon the fact that the railroad company in the operation of its trains has the right-of-way over its tracks and a failure to stop, look and listen before entering upon a crossing is contributory neg-

ligence which bars a right of recovery for simple negligence.

Section 239, Title 7, Code of 1940, makes liberal provision for allowing amendments to the complaint in actions at law as a matter of right, but said section in its concluding sentence provides: "But the court shall have the right to refuse the allowance of any amendment to the complaint *after the conclusion of the argument,* when in its judgment the completion of the trial of the cause would be unreasonably delayed, *or when in its judgment injustice would result."* [Italics supplied.]

This sentence of the statute invests the trial court with broad discretion in allowing amendments, reviewable on appeal for abuse, if the allowance is calculated to work injustice. The defendant had the right to rely on the settled trial practice that special damages not claimed (2 Mayfield's Digest, p. 1028, § 13), though some evidence of such damage is adduced, may be eliminated by requesting written instructions to the jury. Waters v. Weintraub, 255 Ala. 530, 52 So.2d 510. The effect of allowing the amendment of the complaint by claiming special damages for loss of sexual capacity just as counsel for defendant was closing the last argument to the jury, was to deprive the defendant, not only of the right to offer countervailing evidence, but of the right to examine plaintiff's expert medical witnesses as to the claim for special damages and to argue the question to the jury. This is a part of due process and constituted reversible error.

For the errors noted above the judgment of the circuit court is reversed and the cause is remanded.

The Per Curiam opinion follows the dissenting opinion of Justice Thomas rather than the majority opinion written by Chief Justice Anderson in Walker v. St. Louis-San Francisco Ry. Co., 214 Ala. 492, 108 So. 388.

Reversed and remanded.

LIVINGSTON, C. J., and FOSTER, LAWSON, SIMPSON and STAKELY, JJ., concur in the result, as stated in the Per Curiam opinion which follows.

On Rehearing.

PER CURIAM.

The opinion of the majority of the Court heretofore adopted is withdrawn, and the following is substituted for it.

We have given this cause careful reconsideration, especially in respect to the principle of stop, look and listen affecting the claim by defendant of contributory negligence of plaintiff as a defense to the simple negligence count. In holding in the majority opinion that defendant was entitled to the affirmative charge on that account we acted on the assumption that if plaintiff stopped, looked and listened at the time and place named by him, and as required by law, there was nothing to obstruct his view or the sound of the approaching train then bearing down upon the road crossing he was about to pass over, and therefore his statement that he stopped within a few feet of the railroad track and looked and listened, but did not see or hear the train, did not furnish a conflict in that respect sufficient to go to the jury. We relied in part upon the principle of Peters v. Southern Railway Co., 135 Ala. 533, 33 So. 332, and other cases to the same effect.

In reaching our former conclusion we were largely influenced by the photographs offered in evidence. But upon further study of them, we now think they are consistent with other evidence that there was an obstruction of weeds and bank, which might have affected plaintiff's view and the sound of the train, and therefore whether he was negligent in that respect was a jury question.

Although that is true, we think the verdict of the jury is contrary to the great weight of the evidence on that issue and that the motion for a new trial should have been granted. We forego consideration of other questions.

Opinion modified and the application for rehearing overruled.

All the Justices concur, except GOODWYN, J., not sitting.