113 So.2d 788

ATLANTIC COAST LINE RAILROAD COMPANY

· v.

Gary GRIFFITH, pro ami.

7 Div. 488.

Court of Appeals of Alabama.

March 17, 1959.

Rehearing Denied June 30, 1959.

Stringer & Montgomery, Talladega, for appellant.

Love & Hines, Talladega, for appellee.

**PRICE, Judge.**

This is an appeal from a judgment of the Circuit Court of Talladega County in favor of plaintiff for $1,000 in a suit involving a collision between plaintiff's automobile and defendant's train at a public crossing in the City of Talladega.

The complaint contained one count, based upon simple negligence. Defendant's plea was in short by consent. The court submitted to the jury the issues of simple or initial negligence, and subsequent negligence after discovery of peril.

The collision occurred about 11:30 A.M., on November 19, 1955, at a point where defendant's railroad crosses 17th Street. 17th Street runs north and south and the railroad tracks run east and west.

Plaintiff, Gary Griffith, testified that on the day of the collision he was driving a Nash automobile and was proceeding north on 17th Street; that from the time he passed under the traffic light at the Coosa Street intersection until he reached the first railroad track, some 35 or 40 yards away, he was traveling about 15 miles per hour. He was familiar with the crossing and had traveled over it frequently for about ten years; that there are five or six railroad tracks pretty close together at the place where the collision occurred and in his best judgment the collision occurred on the third track. He stopped his car about five feet from the first track, at which

time he looked and listened, but due to about eleven box cars to his right on the first track he was unable to see up the track in the direction from which the train came; that it was about 10 feet from 17th Street to the first box car; that after stopping he changed to low gear, stopped and looked, and then went on and had started to shift gears when the train hit him; that after stopping and starting his automobile he did not again look to the right nor in any other direction except straight ahead; that after he had stopped and started up he did not again use his brakes, but drove his car straight ahead. The window on the driver's side was halfway down and the rest of the windows were up; that it was 20 or 25 feet from where he stopped to the point of collision and after he re-started his car he was in low gear and traveling about five miles per hour. He further testified the train was right at him when he first saw it; that the locomotive struck the center of the automobile on the side opposite the driver, and pushed it down the track about 40 yards. Plaintiff received injuries to his right eye, head and shoulder.

G. C. Dennis, a witness for plaintiff, testified he was driving a milk truck on the day of the collision; that he had just crossed the railroad tracks, going north, and stopped at a house about 120 feet from the track, and as he was getting out of the truck he heard plaintiff holler and went back to the scene of the accident; that at that time he heard no whistle or bell; that before crossing the tracks he stopped his truck about 10 feet from the first track and looked to his right and saw a train coming; that he heard no whistle or bell; that there was nothing to prevent his seeing the train; that he had no idea how fast the train was traveling nor how far it was from the crossing, but he had plenty of time to cross ahead of it; that he did not hear the noise of the train when it crossed at the crossing and did not hear the collision; that he wouldn't say whether or not the whistle blew or bell rang, but he

had no recollection of hearing either of them.

Mrs. Ann Patterson testified she lived on 17th Street in the first house on the left side of the street going north after crossing the tracks and her house was not more than half a block from the most northerly track; that she was looking from a window on the south side and saw the train and car reach the intersection at the same time. The train carried the car about 50 feet down the track. She heard the train coming down the track, but heard no whistle or bell; that the windows in her house were closed.

For the defendant, Virgil Bazemore testified he was in the office of his lumber business, approximately 20 feet from 17th Street and 30 feet from defendant's most southerly track; that he heard the whistle blown two or three times in series, one right after the other, with approximately two seconds between blasts; that 15 to 20 seconds after the last blast of the whistle he heard the collision; that the track is straight for about 500 yards up toward the hospital; that there were no cars on the first track.

Hoyt McClellan testified he was in the Bazemore lumber office; that approximately 5 to 8 seconds before the collision he heard the train whistle blow 2 or 3 times; that he had no recollection of seeing any cars on the first track.

Defendant's train crew testified that when the train passed the S. & R. Lumber Company, beyond the hospital, it was running about 15 miles per hour and continued at that speed past the hospital and as it approached 17th Street. The service brakes had been on constantly for a half mile or more; that the whistle was blowing and the bell ringing; that the bell operates automatically and continues to ring until flipped off; that the engineer blew for the crossing east of 17th Street and kept blowing for the 17th Street crossing.

The brakeman was riding on the left side of the engine in the cab and the fireman was sitting just behind the brakeman. The brakeman stated he could see out the windows on both sides and forward. The fireman testified he was looking out ahead and looked to the left toward the street as the train approached 17th Street. Both testified they first saw the automobile when it was about 50 feet from the main track and the train was about 20 feet from 17th Street; that they immediately hollered to the engineer to "big hole" the engine, which expression means to put the engine in emergency; that the emergency brakes were immediately applied; that the automobile was running from 30 to 45 miles per hour and its speed was never reduced.

The engineer, Mr. Lyles, testified he was riding on the right of the cab and was looking down the track but never saw the automobile before it was struck; that he could not see on the left side but relied on the brakeman to tell him of any traffic approaching from the left; that the engine was about 15 feet from the point of collision when the fireman and brakeman yelled "big hole it", and he immediately applied the emergency brakes.

Mr. Donovant, the conductor, testified the train was made up of a diesel engine, 15 cars and the caboose; that 12 cars were loaded and the rest empty; that the weight of the train was 850 tons; that the brakes were in good condition. He was riding in the caboose and didn't see the automobile until after the collision. He measured the distance from 17th Street to the front of the engine, where it stopped, and it was 392 feet; that he was familiar with the time it takes to stop a train at the speed of this one. Taking into consideration the downgrade, the number of cars and the weight of the train, this was an exceptionally good stop. The automobile came to a stop 54 feet from the crossing. There are six tracks at this crossing, including one which is 75 to 100 feet from the others and runs into the Newbury plant; that the train was on the center track of the five, which is the main line. The track just south of the main track was the passing

track and there were no cars on that track at that time; that the most southerly track is an industrial track and is called scale 2, and is used for industrial purposes and storing cars; that immediately after the accident he investigated the most southerly track and there were some cars on the south end of that track for storage; that there was no car on that track which was not 200 feet or more from 17th Street, and this track was clear for a distance of more than 200 feet from 17th Street.

E. L. Brown, testified he was employed by defendant; that he made certain measurements at the 17th Street crossing with regard to the location of the rails on 17th Street; that from the center of the main track to the center of the southernmost track was a distance of 27 feet 8 inches; that the southernmost rail would be a distance of 2 feet 4 inches farther south; that the distance from the Bazemore office building to the center of the first track was 32½ feet; that the width of 17th Street was 21 feet; that there was a regulation crossing sign on the southwest corner of the crossing, on which were these words: "Railroad Crossing"; that this sign was 25 feet south of the southernmost track and 9½ feet from the edge of the pavement; that there were no red lights at that time, but there is one now.

It is insisted by counsel for appellant that the court erred in refusing to give the affirmative charge requested, with and without hypothesis.

■ "It is established by our decisions that one who is about to cross a railroad track must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. The law thus imposes a continuing duty to see that the way is clear before attempting to cross." Southern Railway Company v. Randle, 221

Ala. 435, 128 So. 894, 897. See also Hines v. Cooper, 205 Ala. 70, 88 So. 133; Southern Railway Company v. Summers, 232 Ala. 417, 168 So. 179; Atlantic Coastline Railway Company v. Flowers, 241 Ala. 446, 3 So.2d 21; Southern Railway Company v. Dear, 26 Ala.App. 508, 162 So. 685. "Where obstructions interfere with his view of the track, it is all the more his duty to stop, look, and listen at a point where he can best see and hear, and, seeing or hearing, avoid an onrushing train." Louisville & Nashville Railroad Company v. Turner, 192 Ala. 392, 68 So. 277, 278; Hines v. Cooper, supra.

■ Plaintiff's own testimony tends to show him guilty of contributory negligence in failing to discharge the duty imposed upon him by law.

Furthermore, we are of opinion after viewing the photographs introduced in evidence showing the tracks and the location of the box cars standing thereon at the time, that plaintiff's testimony that he stopped, looked and listened before going upon the tracks, creates no material conflict in the evidence. Peters v. Southern Railway Company, 135 Ala. 533, 33 So. 332; Atlantic Coast Line Railway Company v. Barganier, 258 Ala. 94, 61 So.2d 35; Southern Railway Company v. Terry, ante, p. 186, 109 So.2d 913, reversed on another ground 268 Ala. 510, 109 So.2d 919.

■ It, therefore, appears that plaintiff is guilty of such negligence as will prevent his recovery against the defendant for simple negligence, if any, on the part of the railroad's employees. Gulf M. & O. Railway Company v. Sims, 260 Ala. 258, 69 So.2d 449; Southern Railway Company v. Terry, supra.

■ A complaint charging simple negligence in general terms is sufficient to authorize a recovery for subsequent negligence. Gulf M. & O. Railway Company v. Sims, supra.

■ The plaintiff and his witnesses testified they did not hear the whistle blow

nor the bell ring before the locomotive entered the intersection.

This "negative evidence to the effect that they did not hear the whistle blow or the bell ring is sufficient evidence to raise a conflict as to whether those acts did occur, even though there was positive evidence that they did occur." Atlantic Coast Line Railway Company v. French, 261 Ala. 306, 74 So.2d 266.

■ In determining the propriety of refusing the affirmative charge the evidence offered by the plaintiff must be accepted as true. McMillan v. Aiken, 205 Ala. 35, 88 So. 135.

The fireman "may have applied the brakes, but it was open for the jury to find that a sharp blast of the whistle" may have warned plaintiff. Pollard v. Crowder, 239 Ala. 112, 194 So. 161. See, also, Gulf M. & O. Railway Company v. Sims, supra, and cases there cited; Southern Railway Company v. Hughes, 267 Ala. 418, 103 So. 2d 324.

It is our conclusion that this case is governed, both as to the refusal of the affirmative charge requested by the appellant, and as to the court's refusal to grant appellant's motion for a new trial on the ground that the verdict is not sustained by the great preponderance of the evidence, by the doctrine enunciated in Gulf M. & O. Railway Company v. Sims, supra, and Southern Railway Company v. Hughes, supra.

■ Defendants requested charges 10, 11, 14 and 15 were properly refused. They are not hypothesized on the evidence, but are mere statements of legal principles without instruction as to the effect upon or application to the issues in the case. Holloway v. State, 37 Ala.App. 96, 64 So. 2d 115, certiorari denied 258 Ala. 558, 64 So.2d 121; Johnson v. Louisville & Nashville Railway Company, 220 Ala. 649, 127 So. 216.

■ Too, the same rules of law were substantially and fairly given in the court's general charge.

■ Requested charge 18 was, in effect, a peremptory instruction as to subsequent negligence, and was properly refused.

Affirmed.

## On Rehearing

In the application for rehearing it is strenuously argued that we are in error in holding "that if no sharp blast of the whistle was blown after discovery of plaintiff's peril, then this is sufficient to make out a case against the defendant on subsequent negligence." It is further argued in brief: "The court has not discussed the evidence with a view to determining whether there was, under the evidence, a case of subsequent negligence under which plaintiff could recover, and our whole purpose in appealing this case was to get the court to pass upon this question as well as the question of contributory negligence."

It is insisted that since the testimony of the fireman and brakeman was that they first saw the automobile when it was 50 feet from the main track, and the train was 20 feet from 17th Street and traveling at the rate of 15 miles per hour there was only a second of time after the trainmen acquired knowledge of plaintiff's peril until the collision occurred, and this was not sufficient evidence to show that the trainmen had time or opportunity, by giving a sharp blast of the whistle, to prevent the accident, "that in addition to proving the actual knowledge of peril and the failure to give a sharp blast of the whistle, evidence must further show that there was sufficient time between the acquiring of knowledge of peril and the collision to have enabled the defendant's trainmen to avoid the collision."

In Mobile Light & R. Co. v. Gadik, 211 Ala. 582, 100 So. 837, 839, quoted with

approval in Gulf, M. & O. R. Co. v. Sims, supra, the court said "If the motorman sees he cannot stop his street car short of the point of collision, the giving of warning signals become more imperative."

"In the case at bar there was evidence that the motorman saw plaintiff's automobile when 25 to 40 feet from the point of contact. There was evidence that the motorman did sound the gong and otherwise strive to prevent the accident, and that plaintiff ran his car into the side of the street car; but there was evidence that no signal of warning was given. Without discussing other features of the evidence, this feature made a case for the jury on negligence after discovery of peril. The affirmative charge on count 1 was properly refused."

■ The plaintiff testified from the time he restarted his automobile after stopping he was in low gear and traveling at five miles per hour. The fireman and brakeman testified the automobile was running from 30 to 45 miles per hour and its speed was never reduced. To paraphrase and use some of the language of the court in Southern Ry. Co. v. Sherill, 232 Ala. 184, 167 So. 731, the jury may have reasonably inferred from the evidence that a timely signal after discovery of plaintiff's peril, might have saved his entrance upon the track, or being thereupon, hastened his departure from the track.

■ On the question of the denial of a new trial, "the correctness of the verdict is strengthened when the presiding judge refuses to grant a new trial, and the verdict should not be set aside because it may not correspond with the opinion of the court as to the weight of the testimony or because it is against the mere preponderance of the evidence." Gulf, M. & O. R. Co. v. Sims, supra [260 Ala. 258, 69 So.2d 454]; Southern Railway Co. v. Hughes, supra.

Application overruled.