BOLIN, Justice.
Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively “Norfolk Southern”)[1] appeal from a judgment entered on a jury verdict awarding compensatory and punitive damages to Ronny P. Johnson, Kim Johnson, Rolison Trucking Company, and Gail Rolison (collectively “the Johnson/Rolison plaintiffs”) on the Johnson/Rolison plaintiffs’ claims arising from a collision at a railroad crossing in Clarke County between a tractor-trailer rig owned by Gail Rolison and being operated by Ronny Johnson and a train being operated by Norfolk Southern. We reverse and remand.

Facts and Procedural History

I. The Crossing

The railroad-crossing collision that is the basis of this action occurred in Clarke County at a railroad crossing located at the intersection of Walker Springs Road and Norfolk Southern’s main-line track between Mobile and Selma. Walker Springs Road is a two-lane paved road that basically runs east and west and is intersected by Norfolk Southern’s main-line track that basically runs north and south between Mobile and Selma. The portion of track at the Walker Springs Road crossing includes a broad curve. The broad curve begins southeast of the intersection and runs generally in a northwesterly direction before turning back to the northeast north of the crossing. The main-line track intersects Walker Springs Road in the middle of the curve at approximately a 65-degree angle.
Located to the south of the Walker Springs Road crossing and adjacent to the main-line track on the west side is a sidetrack. The sidetrack parallels the mainline track along its curvature for a distance of 1,138 feet and then terminates 100 feet south of the crossing. The sidetrack was used by Norfolk for the periodic storage of boxcars necessary for servicing a local industry. Section 103(d) of Norfolk Southern’s operating rules provides:
“Engines or cars left on any track must be properly secured, must clear crossings and crossing signal circuits. When practicable, equipment must be at least 100 feet from public or private crossings. Public crossings must not be obstructed unnecessarily.”
*628 Section 822 of the operating rules provides: “Unattended on-track equipment either on or off the rail must be secured, locked, and left clear of all tracks that are in service without blocking view from crossings.” Gary Utley, a division road foreman for Norfolk Southern responsible for supervising engineers, testified that section 103(d) imposes upon Norfolk Southern not only a duty to maintain boxcars at a distance of not less than 100 feet from a crossing, but also a duty not to place boxcars on a sidetrack in such a way as to impede a motorist’s sight line at a crossing. Gary Wolf, Norfolk Southern’s expert, testified that Norfolk Southern had a duty to maintain a “clearing sight distance” so that a motorist within between 15 and 50 feet of the track has a sight line of approximately 1,100 feet up and down the track. James Franklin, a district train master for Norfolk Southern, testified that Norfolk Southern employees are aware of the 100-foot requirement for cars left on a track but that he did not know if Norfolk Southern gave any direction to its employees regarding obstructed sight lines.
Norfolk Southern had located on both the east and west approach to the crossing on Walker Springs Road regulation railroad crossbuck signs — white, X-shaped signs with the words “Railroad Crossing” written on them. The signs were in good condition and plainly visible on the day of the accident. The crossbuck sign on the east approach to the track was located at 12 feet from the near rail while the cross-buck sign located on the west approach to the crossing was located at 24 feet from the near rail. According to Norfolk Southern’s operating rules, the crossbuck sign should have been placed no further that 12 to 15 feet from the near rail.[2] David Martin, a Norfolk Southern engineer and a member of its safety committee, testified that the Walker Springs Road crossing was a “bad crossing” and that the presence of boxcars on the sidetrack created a “trap” for the public and for Norfolk Southern personnel.
Gerry Faye Griffin lived near the Walker Springs Road crossing and was familiar with it because she had traveled over it “all [her] life.” Griffin described the crossing when the boxcars were present on the sidetrack as follows:
“When the boxcars were pulled onto that siding, all you could see was a line of cars all the way to the horizon. And it’s a curve in the track there, so it makes it more difficult. When you pull up to that crossing to come across, you could not see until — you had to ease, ease, ease your car up so that you could peep around the end of the cars.... My vehicle would have to be so [close] that I could not even see the first rail of the track. I would have to be that close to the track. I would have to peep over to look around the ends of the cars.”

II. The Accident

Ronny P. Johnson lived a few miles east of the Walker Springs Road crossing and was very familiar with the crossing because he traveled over it on a daily basis. Johnson was aware that the crossing was active and that boxcars would frequently *629 be parked on the sidetrack. Johnson testified that when a motorist would approach the Walker Springs Road crossing from the west “you couldn’t see to the right (south)” if boxcars were parked on the sidetrack. He stated that “you would have to be near about all the way up on the track before you could see down the track.”
On February 14, 2005, at approximately 4:15 p.m., Johnson approached the Walker Springs Road crossing from the west in a tractor-trailer rig fully loaded with logs. The log truck was owned by Gail Rolison, and Johnson was operating the log truck within the line and scope of his employment with Rolison Trucking Company. Johnson testified that he came to a complete stop with the front of the truck approximately two feet behind the crossbuck sign. Johnson stated that he shifted the transmission to first gear and was stopped for approximately three to four seconds. Johnson’s view to the north was clear and unobstructed. However, 10 to 12 boxcars were parked on the sidetrack south of the crossing. The north end of the nearest boxcar to the crossing was approximately 200 feet south of the crossing.[3] Johnson stated that he could not see around the boxcars to his right from the point at which he came to a stop behind the cross-buck sign. He testified that he looked to his left (north) and right (south) and listened “real good” but did not hear or see a train. Johnson then began to slowly pull forward. He testified as follows:
“Q. [Counsel for the Johnson/Rolison plaintiffs:] Now, when you started easing forward, which direction did you look?
“A. I was looking to my right.
“Q. You looked to your right?
“A. Yes, sir.
“Q. Toward the boxcars. As you were easing forward, did you see a train?
“A. No, sir.
“Q. Did you hear a train?
“A. No, I didn’t.
“Q. As you were easing forward, did you look in any other direction?
“A. Yes. I looked to my left.
“Q. And, again, why would you be looking to your left?
“A. Because trains use that track both ways.
“Q. You have to look to the left. So you looked to the left?
“A. Yes.
“Q. Did you see a train?
“A. No, sir.
“Q. Did you hear a train?
“A. No, sir.
“Q. And you were continuing to ease forward. What happened next?
“A. I was easing forward, and I was looking to my left. Then I looked straight ahead. And when I looked back, I seen the lights on the train.
“Q. When you looked back to your right, you saw the lights on the train?
“A. Yes, sir.
“Q. The first time?
“A. Yes, sir.
“Q. At the time you saw the lights on the train, could you stop before you got on that railroad track?
“A. No, sir.
“Q. Could you speed up and get across that railroad track?
“A. No, sir.
“Q. You’re in low gear, pulling a fully loaded log truck?
“A. That’s right.
*630 “Q. Were you helpless at that point to do anything?
“A. Yes, sir.
“Q. Now, the last thing you remember seeing was the lights on the train?
“A. Yes, sir.”
Johnson was severely injured when a northbound train collided with the log truck. The train impacted the log truck near where the trailer attaches to the tractor.
On cross-examination, Johnson testified as follows:
“Q. [Counsel for Norfolk Southern:] ... [Y]ou knew the boxcars were there where they were on the day of your accident before you got to the crossing that day? You had seen them there in the days immediately preceding your accident; is that right?
“A. Yes, it is.
“Q. So you knew they were there?
“A. Yes, I did.
“Q. And you knew whether or not they blocked your view and how much they had blocked your view, didn’t you?
“A. Yes, I did.
“Q. Knowing that, Mr. Johnson, may I ask why you didn’t stop with the front of your truck a little bit past the cross-buck sign if, when you stopped behind it, you could not see to the right down the track?
“A. I’ve been across that crossing numbers of times. And when you come to that track, you stop and look and listen. By the time I get to where I can peek around the corner of that boxcar, my truck — the nose of my truck would be up on that track.
[[Image here]]
“Q. As you came up to the crossing and stopped behind the crossbuck, you looked left?
“A. I looked both ways.
“Q. I know. You looked left, though, first?
“A. I was looking to my right.
“Q. You looked right first?
“A. Yes.
“Q. And you saw the boxcars that you had seen on other days in the several days leading up to this accident; is that right?
“A. Yes.
“Q. And you knew at the time of the accident that those boxcars blocked your view to the right?
“A. Yeah. They blocked the view.
[[Image here]]
“Q. But when you stopped, you stopped nonetheless behind the cross-buck and never stopped again, is your testimony? Once you started up, you never stopped again. Is that what your testimony is?
“A. I did like I always do. I stopped, looked and listened and started moving forward. By the time I get where I could peek around the edge of those boxcars, my truck would be up on that track.
“Q. Did you stop again after you began to roll forward after stopping, as you’ve testified, behind the crossbuck?
“A. If I would have stopped again, my truck would be on that track.
“Q. Well, you’ve heard the testimony that the crossbuck was at twenty-four feet, right?
“A. Yes, sir.
“Q. And that’s twenty-four feet from the near rail. You’ve heard that testimony?
“A. Yes, sir.
“Q. So maybe you have to help me out. Why couldn’t you let your truck *631 roll just a little bit and then stop again before reaching the rail?
“A. When I would pull up where I could be able to see around those boxcars, the front of my truck would be on those rails. Before I could see anything down the side of them boxcars, my truck would be up on those rails.[4]
[[Image here]]
“Q. Well, if that crossbuck is twenty-four feet from that near rail, you could certainly stop your truck at some point between that crossbuck and that rail without being on the rail, couldn’t you?
“A. Like I say, by the time I get to where I can look around the corner of that boxcar, the nose of my truck is on this rail, that first rail on this main-line track.
[[Image here]]
“Q. So as you’re looking left and right, you’re just rolling forward. You’re not stopping again, are you?
“A. I looked to my right as I start rolling. I looked to my left. I looked straight ahead. When I looked back right, my truck was on this track.
[[Image here]]
“Q. And its your testimony that there was absolutely no spot between the crossbuck and the rail where you could see the train coming without your truck being on the track. Isn’t that your testimony?
“A. By the time I got to where I could peek down the side of that rail, the side of that — east side of that boxcar, my truck would be on that track.
“Q. Well, that’s because you kept moving? That’s because you kept moving?
“A. If I had made a complete stop there, my truck would have been on that track. I would have still got hit if I had made a complete stop.
“Q. What prevented you from stopping somewhere between the crossbuck and the near rail?
“A. I still wouldn’t have been able to see because of the boxcars.”
The accident was witnessed by Barsha Hunt and Deputy Michael Robinson, the chief deputy for the Clarke County Sheriffs Department, who were at the time of the accident in a line of traffic directly behind Johnson at the crossing. Deputy Robinson testified that he was familiar with the Walker Springs Road crossing and that when boxcars are parked on the sidetrack his view to the south is obstructed when he is traveling eastbound over the crossing and that a motorist traveling east over the crossing could not see a northbound train until it appeared from behind the boxcars. Deputy Robinson testified that “you almost have to get the front end of your vehicle to the track before you can see southbound.” However, Deputy Robinson admitted on cross-examination that he did not know what others could see to the south of the crossing at the time of the accident. Deputy Robinson, who was in the second vehicle behind Johnson, testified that he witnessed Johnson at a complete stop near the crossbuck sign. He stated that Johnson then began to “slow[ly] creep” forward toward the track.[5] Deputy Robinson testified that at the time *632 Johnson started moving forward he had not heard or seen a train. Deputy Robinson stated that, as Johnson neared the track, however, he heard a whistle blow and then two to five seconds later he heard a second whistle blow followed by an almost simultaneous impact between the log truck and the train.
Hunt testified that she lived in the area of the Walker Springs Road crossing and that she was familiar with the crossing. She stated that boxcars would sometimes be parked on the side-track south of the crossing, which would have the effect of obstructing her view to the south when she would travel east over the crossing. Hunt testified that she would have to “take [her] vehicle, the front end of it, your bumper, up to the first railing of the track in order to look around those boxcars.”
Hunt was stopped in the line of vehicles directly behind Deputy Robinson at the time of the accident. Hunt stated that Johnson had stopped the log truck near the crossbuck sign. Hunt stated that she did not initially see or hear a train while she was stopped at the crossing. Hunt testified that she witnessed Johnson “ease [the log truck] up” toward the railroad track and then simultaneously she heard a whistle blow as the train collided with Johnson’s log truck.

III. Inside the Train

Dexter Grandison was employed by Norfolk Southern as a conductor and was seated inside the engine car[6] on the left as the train approached the Walker Springs Road crossing. J.D. Summers was employed by Norfolk Southern as an engineer and was seated inside the engine car on the right as the train approached the Walker Springs Road crossing. Before leaving Mobile, Grandison and Summers had inspected the horn, lights, and brakes on the engine and had determined that they were all in good working order.
Grandison testified that as the train approached the Walker Springs Road crossing he was doing paperwork and keeping a “visual lookout.” He stated that he saw the line of boxcars on the sidetrack to his left and that he could not see over the top of them. Grandison testified that Summers was sounding the horn as they approached the Walker Springs Road crossing but that because the engine was in such close proximity to the adjacent boxcars the sound of the horn vibrated “back off the cars” like they were “in a tunnel or. something.” Data retrieved from the engine’s event-data recorder, i.e., “the black box,” indicates that the engine’s horn was sounded for approximately 21 seconds, or over one-quarter mile, as the train approached the Walker Springs Road crossing.
Grandison testified that he heard Summers say “Oh s — ” and that when he looked at Summers he noticed that Summers’s “eyes had done got real big.” Grandison stated that he then looked down the track and saw the “nose of a truck easing up on the crossing.”[7] Grandison estimated that the train was approximately 150 to 200 feet from the truck at the time he noticed the nose of the truck “easing up on the crossing.” Grandison testified that after seeing the nose of the truck he instantly dove to the floor of the engine and *633 within a “split second” the train collided with the log truck.
Summers testified that as the train approached the crossing he began sounding the engine’s horn as the train passed the “whistleboard” as he was required to do. Summers stated that the train was approximately 500 feet from the crossing when he first noticed the “top of the trailer and the logs” over the row of boxcars on the sidetrack. Summers testified that as the train got closer to the crossing he could see the log truck slowly “coming up to the crossing.” He stated that he never saw the log truck stop. Summers testified that when the train was approximately 100 feet from the crossing the log truck entered the “foul” of the track, i.e., within approximately four feet of the rail. Summers stated that when he realized the log truck was not going to stop at the crossing, he hit the emergency brake and dove for the floor of the engine immediately before the impact with the log truck.[8]

TV. Train Speed,

The speed limit for freight trains at the Walker Springs Road crossing as determined by the Federal Railroad Administration was 49 m.p.h. Grandison testified that the train was traveling at approximately 44^5 m.p.h. as it approached the crossing. Summers testified that the train was traveling at approximately 48-49 m.p.h. as it approached the crossing. Data retrieved from the black box indicates that the speed of the train was 47-48 m.p.h. as it approached the crossing. Wolf testified that based on his evaluation of the available information, including data from the black box, the speed of the train was 47 m.p.h. moments before its impact with the log truck.
However, the Johnson/Rolison plaintiffs assert that there was evidence presented from which it could be determined that the train was actually exceeding the mandated 49 m.p.h. speed limit. The Johnson/Roli-son plaintiffs note that a disk containing the data retrieved from the black box was provided to Utley by Steve Tucker, an attorney for Norfolk Southern. Utley was to print and prepare a document from the disk interpreting the pertinent data retrieved from the black box. The wheel size of the engine must be input into the computer program before the black-box data can be printed from the disk. The evidence indicated that the size of the engine’s wheels could affect the train speed reflected on the transcript of the printed data. For example, if the wheel size is increased, the train speed reflected on the printed data increases; likewise, if the wheel size is decreased, the train speed reflected on the printed data decreases. Tucker told Utley that 40.88 inches was the wheel size to be used in printing the data from the disk. Norfolk Southern states that the Johnson/Rolison plaintiffs’ contention that the wheel size of 40.88 inches was simply “pulled from thin air” by Tucker is misleading. Norfolk Southern contends that the wheel size of 40.88 inches was obtained from records of Union Pacific Railroad, which owned the engine, as verified by Randy Eardensohn, the manager of the Event Recorder Center for Union Pacific.
The Johnson/Rolison plaintiffs next note that Wolf originally testified in his deposition that the train came to rest 1,059 feet *634 past the point of impact, which is consistent with Summers’s testimony that he applied the emergency brake moments before impact and with the data obtained from the black box that reflected a train speed of 47 m.p.h. Wolf testified at trial that this opinion was based on an inaccurate train consist, i.e., the locomotive and the railcars, which did not accurately reflect the running order of the railcars. However, after his deposition and before trial Wolf was provided data obtained from the AEI scanner and the Universal Machine Language Equipment Register (“UMLER”) that indicated that six railcars shown on the train consist to be located at the rear of the train were in fact the first six railcars located behind the engine car at the front of the train. Based on the new information, Wolf opined at trial that the actual stopping distance of the train was 1,417 feet past the point of impact.[9]
Steve McGill, a track supervisor employed by Norfolk Southern, prepared an accident report following the accident in which he indicated that the train stopped approximately 1,500 feet past the point of impact. The Johnson/Rolison plaintiffs conclude that if one accepts McGill’s 1,500-foot stopping distance, then the data from the black box understates the speed of the train. The Johnson/Rolison plaintiffs state that if one accepts the 1,500-foot stopping distance and Summers’s testimony that he applied the emergency brake before impact, then the data from the black box understates the speed of the train even more.

V. Sight Distance

Voluminous photographs of the accident scene were taken on the afternoon of and on the day after the accident. Additionally, Norfolk Southern performed a reenactment of the accident in August 2008, at which time numerous photographs were also taken. This voluminous photographic evidence was introduced by the parties into evidence.
As mentioned above, the north end of the boxcar on the sidetrack nearest to the crossing was approximately 200 feet south of the crossing. The erossbuck sign on the western approach to the crossing where Johnson testified that he stopped was located 24 feet from the near rail of the track. The Johnson/Rolison plaintiffs presented photographs taken by Jimmy Strickland, a railroad workers’ union representative, on the day after the accident before the boxcars on the sidetrack were moved. These photographs were taken from a point at or behind the crossbuck and show that a motorist’s view of the track to the south is obstructed by the boxcars on the sidetrack.
Norfolk Southern presented photographs taken the day of and the day after the accident before the boxcars on the sidetrack were moved. These photographs indicated that a motorist stopped at the crossbuck, whose view of the track to the south was obstructed by the boxcars, had sufficient room to pull forward of the crossbuck — clear of a train moving through the crossing — and obtain an unobstructed view of the track to the south.
Norfolk Southern reenacted the accident in August 2008. Boxcars similar to those present on the day of the accident were placed on the sidetrack with the northern end of the closest one to the crossing being placed 200 feet to the south of the cross *635 ing. The photographs of the reenactment were taken from inside the cab of a tractor-trailer rig with dimensions similar to those of the tractor-trailer rig Johnson was driving on the day of the accident. Two series of reenactment photographs were taken. In the first, an engine car was placed 1,610 feet south of the crossing and the tractor-trailer rig was placed on the western approach to Walker Springs Roads with the front bumper of the tractor 10 feet[10] from the near rail with the driver’s eye being approximately 18 feet from the near rail. The locomotive was then moved north toward the crossing in 70-foot intervals, and the tractor remained stopped with its front bumper 10 feet from the near rail. Photographs were taken at each 70-foot interval. This process was repeated until the last photograph was taken with the train at 70 feet south of the crossing.
The tractor was then backed up until its bumper was 15 feet from the near rail and the driver’s eye was approximately 23 feet from the near rail. The locomotive was then backed up to the south in 70-foot intervals while the tractor’s bumper remained at 15 feet from the near rail. Photographs were again taken at the 70-foot intervals.
The reenactment photographs indicate that a train is visible to the south of the crossing — and unobstructed by the boxcars on the side track — to the driver of a tractor-trailer rig similar to the one being driven by Johnson on the date of the accident when the train was within 1,610 feet or less from the crossing and the front bumper of the tractor was 15 feet or less from the near rail on the western approach to the crossing.
The photographic evidence also shows the curve in this section of the track. The track curves to the east approximately 400 feet south of the crossing, and the photographs demonstrate that this curve actually improves an eastbound motorist’s view of the track to the south.
Darrell Linder, the Alabama State Trooper who investigated the accident and who is also a certified accident reconstruc-tionist, testified that in his opinion Johnson’s view of the oncoming train was not obstructed by the boxcars on the sidetrack and that Johnson had sufficient time and space to see the oncoming train and then yield to it.
Karen Brooks, a school-bus driver who lives in the area of the Walker Springs Road crossing, testified that she drove a school bus over the crossing at approximately 3:30 p.m. (45 minutes before the accident), traveling in the same direction in which Johnson was driving the log truck at the time of the accident. Brooks testified that she stopped the school bus approximately 20 feet from the near rail (6 feet closer to the track than Johnson stated that he stopped) “right at the crossing so that [she] could look up and down the track.” Brooks stated that she saw the boxcars on the sidetrack while she was stopped at the crossing and that they did not obstruct her view of the track to the south. She testified that she could see a “long way” past the boxcars on the sidetrack.

VI. Proceedings Below

On April 12, 2006, Grandison sued Norfolk Southern in the Clarke Circuit Court, asserting a negligence claim under the Federal Employer’s Liability Act, 45 U.S.C. § 51 et seq. (“FELA”), and alleg *636 ing that Norfolk Southern failed to maintain adequate visibility at the Walker Springs Road crossing for motorists to see the approach of oncoming trains; that Norfolk Southern failed to use reasonable care to provide him a reasonable and safe workplace; that Norfolk Southern failed to use reasonable care to provide him with safe and suitable equipment; that Norfolk Southern failed to provide proper standards, policies, or procedures to allow him to perform his duties; and that as the result of Norfolk Southern’s negligence he was severely injured as the result of the collision between the train he was riding and the tractor-trailer rig being operated by Johnson. Grandison also asserted negligence and wantonness claims against Johnson and Rolison Trucking Company, alleging that Johnson negligently and/or wantonly allowed the tractor-trailer rig to collide with the train in which Grandison was riding and that Rolison Trucking, as Johnson’s employer, was vicariously liable for Johnson’s actions. Subsequently, Grandison amended his complaint to add Gail Rolison as a defendant.
On May 9, 2006, Norfolk Southern sued Johnson, Rolison, and Rolison Trucking in the United States District Court for the Southern District of Alabama, Southern Division, alleging negligence and wantonness and seeking to recover for its property damage.
On May 24, 2006, Norfolk Southern answered Grandison’s complaint in the state-court action, denying liability and alleging, among other things, that the sole proximate cause of the accident was Johnson’s negligence and that Grandison’s claims were preempted, precluded, or superseded by federal law.
On May 26, 2006, Johnson, Rolison, and Rolison Trucking answered Grandison’s complaint, generally denying the allegations and asserting certain affirmative defenses. Rolison and Rolison Trucking asserted a counterclaim against Grandison and cross-claims and third-party claims against Norfolk Southern and Summers seeking to recover damages for property and economic loss and alleging negligence, wantonness, and a violation of § 87-2-81, Ala.Code 1975. Johnson also asserted a counterclaim against Grandison and cross-claims and third-party claims against Norfolk Southern and Summers seeking to recover damages for personal injuries under theories of negligence, wantonness, and a violation of § 37-2-81, Ala.Code 1975. Johnson’s wife, Kim, moved to intervene in the action to assert a counterclaim against Grandison and cross-claims and third-party claims against Norfolk Southern and Summers seeking to recover damages for loss of consortium under theories of negligence, wantonness, and a violation of § 37-2-81, Ala.Code 1975. The trial court granted Kim’s motion to intervene.
On May 30, 2006, Johnson, Rolison, and Rolison Trucking moved the federal district court to dismiss or, in the alternative, to stay Norfolk Southern’s federal-court action under the abstention doctrine pursuant to Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). On September 26, 2006, the federal district court entered an order denying the motion to dismiss and granting the motion to stay finding that the “potential for piecemeal litigation” weighed in favor of abstention.
On June 12, 2006, Norfolk Southern moved the Clarke Circuit Court to dismiss the cross-claims against it pursuant to § 6-5^40, Ala.Code 1975.[11] On Novem *637 ber 28, 2006, the trial court entered an order denying Norfolk Southern’s motion to dismiss. Norfolk Southern then petitioned this Court for a writ of mandamus arguing that the cross-claims filed by the Johnson/Rolison plaintiffs were compulsory counterclaims in the prior pending federal action and must be dismissed pursuant to § 6-5-440, Ala.Code 1975. This Court denied Norfolk Southern’s petition, holding that the compulsory counterclaims fell within the exception set forth in Terrell v. City of Bessemer, 406 So.2d 387 (Ala.1981), and should not be dismissed because the federal district court had decided to abstain from exercising its jurisdiction. See Ex parte Norfolk Southern Ry., 992 So.2d 1286 (Ala.2008).
On December 20, 2006, Norfolk Southern and Summers answered the cross-claims and third-party claims asserted by the Johnson/Rolison plaintiffs. Norfolk Southern also asserted a counter-cross-claim against Johnson, Rolison, and Roli-son Trucking seeking to recover for damages to its property.
On December 17, 2007, Norfolk Southern and Summers moved the trial court for a summary judgment as to all claims asserted against them. Norfolk Southern also moved the trial court for a summary judgment as to its counter-cross-claim. On June 27, 2008, the Johnson/Rolison plaintiffs filed their opposition to the motions for a summary judgment. Following a hearing, the trial court, on October 6, 2008, entered an order denying the motions for a summary judgment.
The case proceeded to trial on March 30, 2009.[12] The Johnson/Rolison plaintiffs’ theory of Norfolk Southern’s liability was based on the alleged obstruction of Johnson’s line of sight by the boxcars on the sidetrack, the alleged failure of the train crew to sound the horn on the engine, and the alleged excessive speed of the train. The Johnson/Rolison plaintiffs stipulated at the beginning of the trial that they were making “no claims that the warning devices, traffic guides, traffic signals, or traffic control devices at the Walker Springs [Road] Crossing were inadequate, inappropriate, or violated state or federal law.” Norfolk Southern and Summers moved the trial court for a preverdict judgment as a matter of law (“JML”) at the close of the Johnson/Rolison plaintiffs’ case, which the trial court denied. Norfolk Southern and Summers renewed their motion for a pre-verdict JML at the close of all the evidence, which the trial court also denied.
On April 17, 2009, the jury returned verdicts in favor of Summers on all claims asserted against him; in favor of the Johnson/Rolison plaintiffs on their claims asserted against Norfolk Southern; and in favor of Johnson, Rolison, and Rolison Trucking on Norfolk Southern’s claims against them seeking a recovery for property damage. The jury assessed the Johnson/Rolison plaintiffs’ damages as follows: (1) for Johnson, compensatory damages of $1,500,000 and punitive damages of $3,000,000; (2) for Kim Johnson, compensatory damages of $250,000; (3) for Roli-son Trucking, compensatory damages of *638 $130,000; (4) and for Gail Rolison, compensatory damages of $68,250. On May 7, 2009, the trial court entered a judgment based on the jury verdicts.
On May 18, 2009, Norfolk Southern filed a postverdict motion for a JML as to the negligence and wantonness claims; renewed its motions to dismiss pursuant to § 6-5-440, Ala.Code 1975; moved the trial court for a new trial or, in the alternative, to alter, amend, or vacate the trial court’s judgment as to the property-damage claims; moved the trial court for a remitti-tur against Johnson and Rolison Trucking; moved the trial court for a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986); and moved the trial court for a stay of execution of judgment.
On August 14, 2009, during the hearing on Norfolk Southern’s postjudgment motions, the parties expressly consented on the record, pursuant to Rule 59.1, Ala. R. Civ. P., to extend the trial court’s time for ruling on the pending postjudgment motions through August 24, 2009. On August 21, 2009, Norfolk Southern renewed all of its postjudgment motions. On August 24, 2009, the trial court entered an order denying all Norfolk Southern’s postjudgment motions except the motion for a remittitur as to Rolison Trucking, which it granted in part and remitted that judgment to $69,410. Norfolk Southern filed its timely notice of appeal on September 23, 2009.

Discussion

I. Negligence Claims

Norfolk Southern contends that the trial court erred in submitting the Johnson/Rolison plaintiffs’ negligence claims to the jury because, it says, Johnson was contributorily negligent as a matter of law. Specifically, Norfolk Southern argues that Johnson failed to properly stop, look, and listen at the Walker Springs Road crossing as required by the law of this State and that his failure to do so proximately resulted in the damage suffered by the Johnson/Rolison plaintiffs. The Johnson/Rolison plaintiffs contend that substantial evidence exists demonstrating that Johnson acted consistently with his obligations under the applicable law.

A. Standard of Review

The standard of review for a ruling on a motion for a JML is as follows:
“ ‘When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmov-ant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s rul *639 ing. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).’
“Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).”
CSX Transp., Inc. v. Miller, 46 So.3d 434, 450-51 (Ala.2010).

B. Contributory Negligence

“Contributory negligence is an affirmative and complete defense to a claim based on negligence. In order to establish contributory negligence, the defendant bears the burden of proving that the plaintiff 1) had knowledge of the dangerous condition; 2) had an appreciation of the danger under the surrounding circumstances; and 3) failed to exercise reasonable care, by placing himself in the way of danger.”
Ridgeway v. CSX Transp., Inc., 723 So.2d 600, 606 (Ala.1998). The issue of contributory negligence is generally one for a jury to resolve. Id. See also Savage Indus., Inc. v. Duke, 598 So.2d 856, 859 (Ala.1992) (“The issue of contributory negligence cannot be determined as a matter of law where different inferences and conclusions may reasonably be drawn from the evidence.”).
Section 32-5A-150, Ala.Code 1975, provides, in pertinent part:
“(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
[[Image here]]
“(3) A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
“(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.”
The well established doctrine of “stop, look, and listen” set forth in § 32-5A-150 was discussed at length by this Court in Ridgeway, supra:
“The ‘stop, look, and listen’ doctrine set out in § 32-5A-150 is also firmly rooted in our caselaw. See, e.g., Southern Ry. v. Randle, 221 Ala. 435, 438, 128 So. 894, 897 (1930):
“ ‘It is established by our decisions that one who is about to cross a railroad track must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. The law thus imposes a continuing duty to see that the way is clear before attempting to cross. Hines v. Cooper, 205 Ala. 70, 88 So. 133 [ (1920) ]; Central of Georgia Railway Company v. Foshee [Forshee ], 125 Ala. 199, 27 So. 1006 [(1899)]. In Cunningham Hardware Co. v. Louisville & N.R. Co., 209 Ala. 327, 333, 96 So. 358, 364 [(1923)], it is said of “what is such reasonable precaution,” as follows:
“ ‘ “What is such reasonable precaution was dealt with in Southern Ry. Co. v. Irvin, 191 Ala. 622, 68 So. 139 [ (1915) ], where, adverting to the rule of Central of Ga. Ry. Co. v. Hyatt, 151 Ala. 355, 43 So. 867 [ (1907) ], it is said:
*640 “ ‘ “ Tt is the duty of the person intending to cross a railway to stop, look, and listen for approaching trains; and this use of the senses must be made within such nearness to the track and under such circumstances as will afford the highly important information to the traveler and operate as the precaution the most ordinary prudence, in such circumstances, suggests; and the duty, unless excused as indicated, is continuing at least to the extent of excluding the injection of an element of danger into the situation between the time he last stopped, looked, and listened and the time he enters the zone of danger a moving train would create.’ ” ’
[[Image here]]
“Also deeply rooted in Alabama law is the rule that a person who fails to stop, look, and listen before crossing a railroad track is, in the absence of special circumstances, contributorily negligent as a matter of law. In Lambeth v. Gulf, Mobile & Ohio R.R., 273 Ala. 387, 389, 141 So.2d 170, 172 (1962), Justice Simpson, writing for this Court, stated:
“ ‘The general rule, and governing here to sustain the ruling of the trial court, is that where a motorist fails to “Stop, Look & Listen” before crossing a railroad track, and he thereby runs into or collides with a train on its track at a public crossing, he is guilty of contributory negligence as a matter of law and his negligence will be treated as the sole proximate cause of his injuries. Coe v. Louisville & N.R. Co., 272 Ala. 115, 130 So.2d 32 [ (1961) ]; Watson v. Birmingham Southern R. Co., 259 Ala. 364, 66 So.2d 903 [ (1953) ]; Johnston v. Southern Ry. Co., 236 Ala. 184, 181 So. 253 [ (1938) ]; Southern Ry. Co. v. Lambert, 230 Ala. 162, 160 So. 262 [(1935)]; St. Louis-San Francisco Ry. Co. v. Guthrie, 216 Ala. 613, 114 So. 215, 217, 56 A.L.R. 1110 [ (1927) ]; Louisville & N.R. Co. v. Outlaw, 36 Ala.App. 278, 60 So.2d 367 [ (1951) ], cert. den., 257 Ala. 585, 60 So.2d 377 [(1952)].’
“And in Callaway v. Adams, 252 Ala. 136, 142, 40 So.2d 73, 77-78 (1949), this Court wrote:
“ ‘The contention that there was error in refusing the general affirmative charge as to the contributory negligence of plaintiff is sought to be sustained by the generally stated rule of absolute duty at any railroad crossing where cars and locomotives are liable to be moving of anyone attempting to cross the railroad track to stop, look and listen, and a denial of recovery as for simple initial negligence of the railroad if the failure to discharge such duty proximately caused the injury. Atlantic Coast Line R. Co. v. Jones, 202 Ala. 222, 80 So. 44 [ (1918) ]; Johnston v. Southern [Ry.] Co., 236 Ala. 184, 181 So. 253 [(1938)].
“ ‘The doctrine is rested on the duty of the traveler to keep a continuous lookout as he approaches a railroad crossing until he can see that no train is dangerously near. So, when the undisputed facts disclose that by a proper lookout he could not fail to see the train, he cannot acquit himself of contributory negligence by saying he looked and did not see it.
“ ‘But it cannot be affirmed as a matter of law in every case and under all circumstances that there is an absolute duty to stop, look and listen before a traveler may go upon a railroad crossing, as where one, in the exercise of reasonable care, did not *641 know of the crossing. “What is, or is not, ordinary.care often depends upon the facts of the particular case. The rule, ‘stop, look, and listen,’ is not arbitrary or invariable as to time and place. It may depend in some measure upon the familiarity of the one passing, with the place of crossing ... ”. Louisville & N.R. Co. v. Williams, 172 Ala. 560, 578, 55 So. 218, 223 [ (1911) ].
“ ‘Thus the principle has been developed that the arbitrary rule of stop, look and listen is affected by whether or not the plaintiff knew or by reasonable care could have known he was about to cross the railroad tracks. Sloss-Sheffield Steel & Iron Co. v. Willingham, 243 Ala. 352, 10 So.2d 19 [(1942)] ....
[[Image here]]
[[Image here]]
“Thus, it remains the law in this state that when a motorist, in violation of § 32-5A-150, fails to stop, look, and listen before crossing a railroad track and that failure results in injury or death caused by a collision with a passing train, the motorist is guilty of contributory negligence as a matter of law, unless special circumstances existing at the crossing suggest that even by keeping a proper lookout he could not have been aware of the presence of the railroad crossing or of the danger presented by that crossing. See Lambeth v. Gulf, Mobile & Ohio R.R., supra, and the cases cited therein; Callaway v. Adams, supra, and the cases cited therein; and Norfolk Southern R.R. v. Thompson, [679 So.2d 689 (Ala.1996)]; see also Louisville & N.R.R. v. Williams, 370 F.2d 839 (5th Cir.1966) (citing a number of Alabama cases recognizing both the general rule that it is contributory negligence as a matter of law for a motorist to fail to stop, look, and listen before crossing a railroad track and the exception to that rule that may result from an unusually dangerous crossing); National Railroad Passenger Corp., ('Amtrak') v. H & P, Inc., 949 F.Supp. 1556 (M.D.Ala.1996) (holding under Alabama law that the driver of a truck was con-tributorily negligent as a matter of law in failing to yield the right-of-way to an approaching train).”
Ridgeway, 723 So.2d at 604-08.
The undisputed evidence indicates that Johnson was familiar with the crossing— he lived in the area of the crossing and traveled over it on a daily basis — and that the crossing was active with trains traveling both northbound and southbound along the track at the crossing. Johnson also testified that he was aware that boxcars were parked on the sidetrack and that the boxcars could obstruct his view to the south of the track. Accordingly, we conclude that Norfolk Southern established as a matter of law that Johnson was aware of the Walker Springs Road crossing and that he understood or should have understood the danger presented by the crossing. Ridgeway, supra. We next must determine whether Norfolk Southern established as a matter of law that Johnson failed to exercise reasonable care, i.e., that he failed to stop, look, and listen, when he attempted to cross the track at the Walker Springs Road crossing.
The evidence indicates that Johnson came to a complete stop with the front of the log truck approximately two feet behind the crossbuck sign, which was located 24 feet from the track. From the point at which Johnson stopped behind the cross-buck sign, his view to the south was obscured by the boxcars on the sidetrack. Johnson looked to his left (north) and to his right (south) and listened “real good” but did not hear or see a train. He then *642 began to pull forward slowly. Johnson stated that, as he was pulling forward, he looked to his left and then straight ahead and that when he looked back to his right he saw the lights of the train and could not stop the log truck before it rolled onto the track.
When questioned on cross-examination as to why he did not pull past the crossbuck a short distance to gain a better view of the track to the south, Johnson stated that “by the time I get to where I can peek around the corner of that boxcar, my truck ... the nose of my truck would be up on that track.” This testimony is belied by the fact that the photographic evidence presented by Norfolk Southern clearly demonstrates that Johnson had sufficient space to pull the log truck forward of the crossbuck without entering the zone of danger presented by the track and to ascertain whether a train was approaching from the south. Johnson himself admitted that as he was easing forward he first looked to his left and then straight ahead and that he did not look back to his right until he was already on the track and that he then saw the lights on the train. As discussed in Ridgeway, supra, and the cases cited therein, Johnson had a continuing duty to keep a proper lookout from the time he first stopped at the crossbuck sign until he crossed the track. He cannot acquit himself of contributory negligence by stating that he could not see what was there to be seen. Further, Johnson’s testimony that, “by the time I get to where I can peek around the corner of that boxcar, my truck ... the nose of my truck would be up on that track,” does not create a conflict in the evidence where the photographic evidence indicates otherwise. Ridgeway, supra; Serio v. Merrell, Inc., 941 So.2d 960 (Ala.2006). See also National R.R. Passenger Corp. (“Amtrak”) v. H & P, Inc., 949 F.Supp. 1556, 1564 (M.D.Ala.1996) (entering a summary judgment for railroad in crossing-collision case, stating that “[plaintiffs] statement that he neither saw an approaching train, nor heard the train’s whistle or bell, is not sufficient, given the photographic evidence to the contrary, to create a conflict in the evidence”); Atlantic Coast Line R.R. v. Barganier, 258 Ala. 94, 101, 61 So.2d 35, 42 (1952)[13] (“[p]laintiffs testimony that he stopped, looked, and listened, in the face of the circumstances that if he had stopped, looked, and listened he could have either heard or seen the train which was moving toward the crossing and near thereto when the plaintiff drove his automobile on the railroad track, does not constitute a conflict in the evidence....”); Southern Ry. v. Terry, 40 Ala.App. 186, 190, 109 So.2d 913, 916 (1958), reversed on other grounds, 268 Ala. 510, 109 So.2d 919 (1959) (“Had Gibson stopped, looked and listened, he could have seen or heard the train approaching when he drove the tractor onto *643 the track. His testimony to the contrary, in view of the photographic evidence showing otherwise, constitutes no conflict in this regard.”); Atlantic Coast Line R.R. v. Griffith, 40 AIa.App. 364, 868, 113 So.2d 788, 792 (1959) (“[W]e are of opinion after viewing the photographs introduced in evidence showing the tracks and the location of the box cars standing thereon at the time, that plaintiffs testimony that he stopped, looked and listened before going upon the tracks, creates no material conflict in the evidence.”).
The physical facts depicted in the photographs presented by Norfolk Southern are further substantiated by the testimony of Karen Brooks and Trooper Linder. Brooks, the school-bus driver, drove over the crossing approximately 45 minutes before the accident in a school bus traveling in the same direction Johnson was traveling at the time of the accident. Brooks testified that she stopped the school bus approximately 20 feet from the near rail (6 feet closer to the track than Johnson stated that he stopped) and stated that she saw the boxcars on the sidetrack. Brooks testified that the boxcars did not obstruct her view of the track to the south, stating that she could see a “long way” past the boxcars on the sidetrack. Trooper Linder, the state trooper who investigated the accident and who also is a certified accident reconstructionist, opined that Johnson’s view of the oncoming train was not obstructed by the boxcars on the sidetrack and that Johnson had sufficient time and space to see the oncoming train and then to yield to it.
The Johnson/Rolison plaintiffs challenge Norfolk Southern’s sight-distance evidence as depicted in the photographs in several regards. They first argue that they presented their own photographic evidence that shows the obstructed view to the south. We note that those photographs were taken at a point behind the crossbuck and farther away from the crossing. That there was some point at or behind the crossbuck — some distance away from the track — where a motorist’s view to the south was obstructed by the boxcars on the sidetrack is not disputed. However, as discussed above, the photographic evidence presented by Norfolk Southern indicates that Johnson had sufficient space to pull his log truck beyond the crossbuck and to obtain an unobstructed view to the south of a northbound train, all the while remaining clear of the zone of danger.
The Johnson/Rolison plaintiffs next contend that eyewitnesses to the accident, Deputy Robinson and Barsha Hunt, both testified that the Norfolk Southern reenactment photographs did not accurately depict the view an eastbound motorist had of the track to the south of the crossing on the day of the accident. Hunt testified that the boxcars in one of the photographs shown to her appear to be “further back” than the boxcars on the sidetrack the day of the accident. Additionally, both Deputy Robinson and Hunt testified that when boxcars were parked on the sidetrack a motorist would almost have to pull up on to the track in order to obtain an unobstructed view to the south. The Johnson/Rolison plaintiffs’ arguments based upon this testimony fail for several reasons.
We first note that both Deputy Robinson and Hunt were in a line of traffic behind Johnson on the day of the accident and did not have the same point of view to the south as did Johnson at the time of, and just before, the accident. Although both Deputy Robinson and Hunt testified that when boxcars were parked on the sidetrack a motorist would almost have to pull up onto the track in order to obtain an unobstructed view to the south, neither offered testimony as to a motorist’s view to *644 the south at the time of the accident. On the prior occasions referenced by Deputy Robinson and Hunt the boxcars could have been parked on the sidetrack closer to the crossing than the 200 feet measured at the time of the accident, thus requiring a motorist to pull closer to the track in order to obtain an unobstructed view to the south. Deputy Robinson expressly stated on cross-examination that he did not know what others could see to the south of the crossing at the time of the accident. Finally, of the multitude of photographs presented at trial, Hunt could point to only one photograph and testify that the boxcars on the sidetrack appeared to be “further back” than were the boxcars on the day of the accident.
As for the reenactment photographs, the Johnson/Rolison plaintiffs state that the tractor used in the reenactment was dissimilar from the tractor being driven by Johnson on the day of the accident. Johnson was driving a Kenworth brand model W900-L (“L” stands for longed-nosed) on the day of the accident. The reenactment was performed using a Freightliner brand tract or. The Johnson/Rolison plaintiffs argue in their brief that the reenactment photographs appear to place the tractor 22 inches closer to the track than where Johnson actually was on the day of the accident, thus giving the photographer of the reenactment photographs a better view of the track to the south. However, the purported distance of 22 inches is simply not supported by the evidence, because the Kenworth brand tractor model W900-L measures 130 inches from the front bumper to the rear of the cab and the Freight-liner brand tractor used in the reenactment measured 120 inches from front bumper to the rear of the cab, a difference of only 10 inches. Notwithstanding the difference in length of the two tractors, we believe the more relevant comparison between the two tractors is the distance from the front bumper to the rear of the driver’s door on each tractor, which is exactly the same on both tractors, i.e., 108 inches. The conclusion, based on this comparison, is that Johnson’s eyes and the photographer’s eyes were the same approximate distance from the track even though Johnson’s Kenworth tractor was longer, giving Johnson the same relative point of view to the south as is depicted in the reenactment photographs.[14]

C. Special Circumstances

This Court stated in Ridgeway:
“[W]hen a motorist, in violation of § 32-5A-150, fails to stop, look, and listen *645 before crossing a railroad track and that failure results in injury or death caused by a collision with a passing train, the motorist is guilty of contributory negligence as a matter of law, unless special circumstances existing at the crossing suggest that even by keeping a proper lookout he could not have been aware of the presence of the railroad crossing or of the danger presented by that crossing.”
728 So.2d at 607. The Johnson/Rolison plaintiffs argue that the boxcars located on the sidetrack constituted a special circumstance that prevented Johnson from discovering the danger at the crossing despite his keeping a proper lookout. As discussed above, the photographic evidence presented by Norfolk Southern demonstrates that had Johnson satisfied his continuing duty to keep a proper lookout as he pulled the log truck forward of the crossbuck he could have discovered the danger presented by the approaching train. Accordingly, we find that no special circumstances, as discussed in Ridgeway, supra, exist in this case and that any failure in this regard did not proximately cause the collision.

D. Speed and Horn Claims

The jury rejected the Johnson/Rolison plaintiffs’ claims to the extent they were based on the speed of the train and the alleged failure of its occupants to sound the train’s horn. The jury returned a verdict in favor of engineer Summers on the Johnson/Rolison plaintiffs’ claims against him. This Court can infer from the jury’s verdict in favor of Summers that the horn was properly sounded and the speed of the train was not excessive. See Louisville & N. R.R. v. Garrett, 378 So.2d 668, 676 (Ala.1979) (jury entered verdict in favor of locomotive engineer in collision-crossing case, and this Court held that “[s]ince the jury exonerated [the engineer] of any negligence, it can be inferred that he properly sounded the whistle and rang the bell”). The verdict in favor of Summers is supported by substantial evidence; both Summers and Grandison testified that the train’s horn was being sounded and that it was traveling within the speed limit as it approached the Walker Springs Road crossing. Additionally — and telling — is the fact that the data retrieved from the train’s black box also indicates that the train was within the speed limit and that the horn was being sounded as the train approached the crossing.

E. Conclusion on Negligence Claims

After carefully reviewing the record in this case, we conclude that Johnson failed to exercise reasonable care, i.e., that he failed to properly stop, look, and listen, as required by law when he attempted to cross the Walker Springs Road crossing and that he was contributorily negligent as a matter of law. Accordingly, the trial court erred in denying Norfolk Southern’s motion for a JML and in submitting the Johnson/Rolison plaintiffs’ negligence claims to the jury.

II. Wantonness

Norfolk Southern contends that the Johnson/Rolison plaintiffs failed to present substantial evidence of any wantonness on its part and that the trial court erred in denying its motions for a JML and submitting the wantonness claims to the jury.
“Wantonness is conduct ‘carried on with a reckless or conscious disregard of the rights or safety of others.’ Ala.Code 1975, § 6 — 11—20(b)(3). Specifically, wantonness involves the conscious doing of some act, or the omission of some duty, under knowledge of existing conditions and while conscious that from the doing of such act or omission of such duty *646 injury will likely or probably result. Before a party can be said to be guilty of wanton conduct, it must be shown that, with reckless indifference to the consequences, he consciously and intentionally did some wrongful act or omitted some known duty that produced the injury. Hamme v. CSX Transp., Inc., 621 So.2d 281 (Ala.1993).”
Ridgeway, 723 So.2d at 608. This Court has stated:
“ ‘ “ ‘Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....
“ ‘ “ ‘Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as ... a conscious ... act. “Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted.” McNeil v. Munson S.S. Lines, 184 Ala. 420, [423], 63 So. 992 (1913)....”””
Ex parte Essary, 992 So.2d 5, 9-10 (Ala.2007) (quoting Tolbert v. Tolbert, 903 So.2d 103, 114-15 (Ala.2004), quoting in turn other cases) (emphasis omitted). To establish a claim of wantonness, “the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.” Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994). Proximate cause is an essential element of both negligence claims and wantonness claims. Gooden v. City of Talladega, 966 So.2d 232 (Ala.2007).
As set forth above:
“ ‘The general rule, and governing here to sustain the ruling of the trial court, is that where a motorist fails to “Stop, Look & Listen” before crossing a raih'oad track, and he thereby runs into or collides with a train on its track at a public crossing, he is guilty of contributory negligence as a matter of law and his negligence will be treated as the sole proximate cause of his injuries.’ ”
Ridgeway, 723 So.2d at 605 (quoting Lambeth v. Gulf Mobile & Ohio R.R., 273 Ala. 387, 389, 141 So.2d 170, 172 (1962)) (emphasis added). Although the Johnson/Ro-lison plaintiffs contend that the accident in this case was caused by the boxcars on the sidetrack obstructing Johnson’s view to the south, the failure of the train crew to sound the horn, and the excessive speed of the train, the evidence, as discussed above, indicates that Johnson failed to properly “stop, look, and listen” as required by law before he attempted to cross the railroad track. Johnson’s negligence in failing to “stop, look, and listen” is treated as the sole proximate cause of the Johnson/Roli-son plaintiffs’ injuries. Id. Accordingly, any alleged wantonness on the part of Norfolk Southern could not have been the proximate cause of the accident, and Norfolk Southern was entitled to a JML on the wantonness claims. See Middaugh v. City of Montgomery, 621 So.2d 275 (Ala.1993) (affirming a summary judgment on negligence and wantonness claims where the evidence indicated that the motorist’s failure to yield at intersection was the sole proximate cause of the accident); and Borden v. CSX Transp., Inc., 843 F.Supp. 1410, 1424 n. 9 (M.D.Ala.1993) (affirming a summary judgment on negligence and *647 wantonness claims in railroad-crossing case where plaintiffs failure to “stop, look, and listen” at crossing was the sole proximate cause of the accident and stating “if a Defendant in the instant case had been wanton or negligent, such wantonness or negligence could not have been a proximate cause of the subject accident”).

III. Norfolk Southern’s Property-Damage Claim

Norfolk Southern asserted negligence and wantonness claims against Johnson, Rolison, and Rolison Trucking alleging that Johnson, as an employee of Rolison and Rolison Trucking, negligently and wantonly operated the log truck so as to cause it to collide with a train being operated by Norfolk Southern, causing damage to the train. The jury returned verdicts in favor of Johnson, Rolison, and Rolison Trucking on Norfolk Southern’s property-damage claims. Norfolk Southern filed postjudgment motions to alter, amend, or vacate that judgment, or for a new trial. Because we have determined that Johnson’s negligence in failing to properly “stop, look, and listen” before crossing the railroad track was the sole proximate cause of the accident, the judgment entered on the verdict in favor of Johnson, Rolison, and Rolison Trucking on Norfolk Southern’s property-damage claims must be reversed. Any motion to dismiss based on Norfolk Southern’s prior pending federal action should be addressed by the parties and the trial court on remand.

Conclusion

We reverse the judgment entered in favor of the Johnson/Rolison plaintiffs on their negligence and wantonness claims against Norfolk Southern. We also reverse the judgment in favor of Johnson, Rolison, and Rolison Trucking on Norfolk Southern’s claims seeking recovery for damage to its property. Because we are reversing the judgment on the grounds addressed above, we pretermit discussion of the remaining issues presented.
REVERSED AND REMANDED.
WOODALL, STUART, PARKER, SHAW, and MAIN, JJ., concur.
MURDOCK, J., concurs in the result.
COBB, C.J., dissents.

. Norfolk Southern Railway Company is a subsidiary of Norfolk Southern Corporation.

. Norfolk Southern had represented from the beginning of the litigation process that the crossbuck sign on the west approach to the crossing was located 12 feet from the track on the day of the accident and in compliance with its operating rules. However, it was revealed during the course of the trial that the crossbuck sign on the west approach to the crossing was actually located 24 feet from the track on the day of the accident and not in compliance with Norfolk Southern's operating rules. Subsequently, Norfolk Southern stipulated during trial that the crossbuck sign was not located 12 feet from the track but was, in fact, located 24 feet from the track on the day of the accident.

. This measurement was taken by employees of Norfolk Southern.

. It must be noted that Gail Rolison testified that the tractor in question measured approximately 130 inches (10.8 feet) from front bumper to the rear of the cab. Johnson testified that his seat was positioned all the way to the rear of the cab.

. Deputy Robinson testified in an earlier deposition that he did not witness Johnson move forward.

. The engine was owned by Union Pacific Railroad and was being operated by Norfolk Southern.

. Grandison testified that the engine was in the curve on the approach to the crossing and that his view of the western approach to the crossing was blocked by the boxcars on the sidetrack to his left. Thus, the only thing he could see beyond the boxcars was the nose of the log truck.

. Summers stated that he intended to activate the emergency brake. However, evidence from the engine's event-data recorder, i.e., "the black box,” indicates that Summers may have activated the locomotive brake rather than the emergency brake in the process of diving to the floor of the engine and that the train went into emergency-braking mode only as the result of the impact with the log truck.

. The UMLER registry contains the weight and length of every railcar operating in North America. The AEI scanner is positioned on each track and electronically records each railcar and its order in the train consist as the train passes the scanner. The six railcars that were determined to be at the front of the train were approximately 358 feet in length and account for the difference between 1,417 feet and 1,059 feet.

. A vehicle is not considered to be “fouling a track” if it is more than four feet from the track.

. Section 6-5-440 provides: "No plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party. In such a *637 case, the defendant may require the plaintiff to elect which he will prosecute, if commenced simultaneously, and the pendency of the former is a good defense to the latter if commenced at different times.”

. On that date, Grandison moved to dismiss his claims against the Johnson/Rolison plaintiffs and the Johnson/Rolison plaintiffs moved to dismiss their claims against Grandison. The trial court granted the motions to dismiss. During jury deliberations and prior to the jury's returning its verdict in this case, Grandison and Norfolk Southern reached a compromise settlement as to Grandison's FELA claim. Therefore, Grandison is not a party to this appeal.

. The Barganier Court had originally concluded that the plaintiff’s testimony that he stopped, looked, and listened did not constitute a conflict in the evidence in the face of circumstances that if he had stopped, looked, and listened he would have seen the train. In reaching this conclusion, the Court relied largely upon photographs that were offered into evidence. However, on rehearing the Court withdrew its original holding upon further consideration of the photographs and determined that the photographs were consistent with other evidence indicating that there was an obstruction at the crossing that might have affected the plaintiff’s view and whether the plaintiff heard the train. 258 Ala. at 105, 61 So. 2d at 45. The Court did not criticize or disparage the principle made the basis of its original conclusion, it simply determined that the photographs were consistent with other evidence. By contrast, the photographs here are inconsistent with Johnson’s testimony that he could not obtain an unobstructed view to the south until the nose of his truck was on the track.

. Despite the contentions in the Chief Justice's dissent, Johnson's testimony and the testimony of the other witnesses do not create a question of fact for the jury. There is no dispute that Johnson stopped at the crossbuck and that he did not have a clear line of sight to the south at the point where he stopped behind the crossbuck. However, as discussed above, Johnson's duty to "stop, look, and listen” was a continuing duty, and he cannot create a question of fact by simply stating that his view of the track to the south was obscured in the face of clear photographic evidence indicating that he had sufficient space to pull his truck forward of the crossbuck in order to obtain a clear line of sight. As for the dissent’s reliance upon the other witnesses’ testimony for the creation of a question of fact, none of the witnesses had the same point of view of the track to the south as did Johnson, because the witnesses were in a line of traffic behind Johnson. No witness offered testimony as to the point of view to the south at the time of the accident. In fact, Deputy Robinson expressly stated on cross-examination that he did not know what another motorist could see to the south of the track at the time of the accident. Finally, the dissent focuses only on the reenactment photographs and the challenges to their accuracy, completely ignoring the photographs taken the day following the accident and prior to the removal of boxcars from the sidetrack, depicting sufficient space in which Johnson could have pulled forward of the crossbuck and obtained a clear view to the south.